Conway, Ch. J.
On December 14, 1953 the State Commission Against Discrimination commenced hearings on the complaint of Anita Brown, a Negro woman, against the petitioner, Castle Hill Beach Club, Inc., a membership corporation which operates a bathing and recreation park 16 acres in size, in Bronx County, accommodating about 13,000 persons on a seasonal membership basis and over 10,000 persons per season on a daily guest admission basis. Mrs. Brown complained that petitioner was operating a place of public accommodation and, in refusing her season locker rights, had discriminated against her because of her color. After extensive hearings, the commission upheld the complaint and made an order directing the membership corporation to cease and desist from the unlawful discriminatory practice and requiring the membership corporation to take stated affirmative action. The order of the commission was modified by the Appellate Division.
On this appeal we are called upon to determine (1) whether, at the time of the commission of the alleged act of discrimination, the membership corporation was operating a place of public accommodation, resort or amusement, within the meaning of section 40 of the Civil Bights Law and subdivision 9 of section 292 of the Executive Law; if it were (2) whether there is support in the record for the finding of the commission that the membership corporation discriminated against the complainant because of her color, and, finally, (3) whether the membership corporation was denied a fair hearing before the commission *601 and its constitutional rights infringed by that body. We are agreed that questions (1) and (2) must be answered in the affirmative and that question (3) must be answered in the negative.
From iy28 through 1950, Castle Hill Estate, Inc., a stock corporation, owned the facilities in question and operated them as a commercial enterprise. During the period from 1945 through 1951, William L. Sayers, an attorney, and members of his and his deceased brother’s family owned all of the stock and were the officers and directors of the corporation. From 1928 through 1946 admission to the facilities could be gained on a season or a daily basis. In 1947 the admission policy was changed. Admissions on a daily basis were eliminated and the facilities were made available only to those paying a season charge and their guests. Concededly, the facilities were open to the free and unrestricted use of the public from 1928 through 1950 and during those years the park was operated as a place of public accommodation. Since there Avere no daily admissions after 1947, it is clear that the membership corporation recognizes that daily admissions is not the criterion which determines the public or private character of a place of accommodation — a place may be public though a weekly, monthly or seasonal basis for charging for admission is employed. That brings us to the crucial question of Avhether, with the formation of the membership corporation in 1950, the facilities were converted from a public to a private accommodation. Such is the claim of the membership corporation. The commission and the courts below have held otherwise.
In November of 1950 Castle Hill Estate, Inc., as landlord, leased the premises to the neAvly formed membership corporation for the year 1951. Thereafter, in August of 1951, Castle Hill Estate, Inc., conveyed title to a neAA'ly created stock corporation, Bronx-City Island Realty Corporation, Avhieh thereupon became the membership corporation’s neAv landlord. William L. Sayers and family were the sole stockholders and officers of Bronx-City Island Realty Corporation. The 1951 rental stipulated in the lease betAveen Castle Hill Estate, Inc., and the membership corporation was (A) $50,000 or (B) the gross annual receipts less taxes and operating expenses, at the landlord’s option. Under option (B) the lease set forth a schedule of amounts or rates that the landlord coiild ask of the tenant *602 as rent for the use of bathhouses. The lease was extended for two years by Bronx-City Island Realty Corporation upon the same terms and conditions, except that during 1952 and 1953 the rates for the various types of season bathhouse occupancy were slightly higher. During all three years the landlord exercised option (B), thus earning for its stockholders the very same sum which it would have earned for them had it been operating the facilities directly, as had been the method of operation prior to the formation of the membership corporation. By its lease, Castle Hill Estate, Inc., reserved the right to approve all checks and drafts on any of the membership corporation’s funds on deposit. This, of course, demonstrates that the landlord-lessor possessed a large, and, in our judgment, an unusual measure of control over the financial affairs of its lessee, the membership corporation. When the membership corporation opened its checking account, checks were authorized to be signed by any two of four named persons, three of whom were officers of Castle Hill Estate, Inc. The fourth person was the president of the membership corporation who had previously been an officer of Castle Hill Estate, Inc., and its general manager. Thus, it will be seen that it was impossible for the lessee to draw a check without the approval of at least one of the lessor’s officers. The moneys deposited in this bank account represented deposits made in 1950 with Castle Hill Estate, Inc., by persons desiring season bathhouses for the 1951 season. However, the members of the public who made such deposits were not consulted or advised as to the transfer of their funds from the stock corporation, Castle Hill Estate, Inc., to the membership corporation.
The season member rates during 1950 when Castle Hill Estate, Inc., operated the facilities were the same as the season member rates in 1951 when the membership corporation operated them. The facilities were substantially the same before and after the formation of the membership corporation. Prior to the creation of the membership corporation three men were employed by Castle Hill Estate, Inc., in managerial capacities, and these men were continued as managers by the membership corporation. One of these had been an officer of Castle Hill Estate, Inc. All three were officers and directors of the membership corporation and two were on the members’ governing committee.
*603 From 1928 through 1951, Castle Hill Estate, Inc., the original owner and operator of the park and the membership corporation’s first landlord, occupied the same two offices as those occupied by the membership corporation — at the site of the park and in the law office of William L. Sayers. Since its organization in 1951 and through 1953, the new landlord occupied the same offices as those occupied by the membership corporation. Since its organization and through 1953, the books of the membership corporation were kept at said two offices and the membership corporation had employees perform their services at said two offices.
After the formation of the membership corporation the facilities were available only to “ seasonal club members ” and their guests. But that fact is quite immaterial in determining whether the membership corporation was operating a public or private place of accommodation for, prior to the formation of the membership corporation, when the park was concededly a place of public accommodation, the facilities were likewise available only to those paying a season charge and their guests. As we see it, our inquiry must be more searching. We think that due consideration must be accorded to (1) the means by which one obtains a membership and (2) the rights which flow from the procurement of a membership.
Prior to 1950 when the park was concededly operated as a place of public accommodation, any member of the general public could obtain a membership, if such were available — which entitled him to use the facilities- — -by paying the prescribed season rate. (At the end of each summer the membership terminated automatically.) After 1950 when the facilities were operated by the membership corporation, anyone who had previously been a season member at the park could likewise obtain a membership, if such were available — which entitled him to use the facilities — by simply paying the prescribed rates. A person who had not previously been a season member had, in addition, to fill out an application. Under the by-laws the members’ governing committee, consisting of six persons. “ shall examine and take action upon all applications for seasonal membership ”. As a matter of fact and procedure, however, applicants were taken in on their face value, without interview, investigation or sponsorship, upon the recommendation of either of two members of the members’ governing com *604 mittee. The recommendation was' given unless the applicant was known to be a disorderly person. The names of seasonal members were not posted on a bulletin board and no notification of any kind with respect to said applicants was given to the seasonal members either before or after their approval. Thus, it would appear that the applicant performed, in effect, a meaningless act when he completed the application form, for his application was approved as a matter of course. At the end of each summer the membership which one obtains, with or without having filled out the application form, terminates automatically. The patrons of the facilities, both before and after the formation of the membership corporation, were not limited to any geographical area; were not limited to any occupational category; were not limited to any age group; were not limited as to number, other than the capacity of the facilities, and were not limited to any social or economic status. Indeed, the record fails to reveal that they were limited in any way. Stated conversely, in reality the facilities — both before and after the formation of the membership corporation — were open to all, other than persons known to be disorderly persons.
The membership corporation — which it must be remembered was organized by an attorney who, presumably, was aware of the power of exclusion possessed by a place of resort or amusement- — urges that it was created as a membership corporation in order to keep out of the park certain undesirable types of persons, e.g., petty thieves, “ roughnecks ” and troublemakers and that so long as Castle Hill Estate, Inc., owned and operated the park as a “ public place ” it could not exclude such persons. However, this court pointed out in Madden v. Queens County Jockey Club (296 N. Y. 249) that places of amusement and resort as distinguished from those engaged in a public calling, such as innkeeper or common carrier, enjoy an absolute power to exclude those whom they please, subject only to the legislative restriction that they not exclude one on account of race, creed, color or national origin. In the Madden case this court upheld the right of a race track to exclude Madden even though the exclusion was without good cause. Manifestly, therefore, it was not necessary for the Sayers family to form a membership corporation to be possessed of the right to exclude disorderly persons. As a matter of fact, both before and after the formation of the membership *605 corporation, the management exercised the power of exclusion by denying seasonal membership to persons known to be disorderly persons. As the commission has held, the asserted reason for forming the membership corporation cannot be accepted as the true reason for forming it, in view of the facts (1) that the management had exercised the power of exclusion both before and after the formation of the membership corporation and (2) that the membership corporation took no steps whatever to effectuate the purpose for which it assertedly was formed. That is, although it is claimed that the membership corporation was formed to enable the management to exclude undesirable persons, no effort was made to screen applicants — there was no interview, no investigation and no sponsorship. Applicants were accepted as a matter of course. All that the membership corporation did in the way of making certain that only desirable persons were admitted was to exclude persons known to it to be undesirables. As we have said, the management had done the same thing prior to the formation of the membership corporation.
One who became a seasonal member after the formation of the membership corporation had no more say on matters affecting the management, affairs, finances, property, business or policies of the membership corporation than a seasonal member had on such matters when the enterprise was conducted by the stock corporation. The Sayers family controlled and managed the facilities both before and after the formation of the membership corporation. Under the terms of the by-laws, seasonal members are not entitled to vote on any amendment or repeal of a by-law or on any new by-law ‘ ‘ now or hereafter adopted ’ ’. The by-laws were prepared by William L. Sayers and, from the time the membership corporation was organized in 1950 through 1953, said by-laws have been kept in Sayers’ law office. The seasonal members were never afforded the opportunity of approving or disapproving the by-laws. Copies of the by-laws were never distributed to the seasonal members and no copies were ever posted on the bulletin board at the park.
The name of the membership corporation, Castle Hill Beach Club, Inc., was substituted in the listing under “Bathing Beaches —Public ’ ’ in the Bronx Classified Telephone Directory, in the years 1951,1952 and 1953, for the name of its predecessor, Castle Hill Bathing Park, with the same address and telephone *606 number. In those years, the Bronx Classified Telephone Directory contained a heading entitled “ Clubs ” under which about 100 clubs were listed. During* that period the membership corporation was not listed under that heading. On various pages throughout the directory the legend appeared: ‘ ‘ Will you please check your listing in this directory. If not correct please call the Telephone Business Office.”
Although the membership corporation’s three officers testified at the hearing*, none of them denied knowledge of the above-stated listings. It seems reasonable to assume that the change in name made in the directory was made at the direction of some authorized representative of the club. It seems to us that it is common knowledge, and that we may take judicial notice of the fact, that a telephone listing in a classified directory does not serve only one purpose — that of enabling interested persons to communicate by telephone. The classified directory— or the “ Red Book ” as it is commonly called — lists telephone numbers according to the nature and character of the business or service offered by those whose numbers are listed. This is not solely for the purpose of enabling interested persons to communicate by telephone. When one uses the Red Book he doesn’t only look for a telephone number and it wasn’t intended that he should. Indeed, he may not look for a telephone number at all, but, rather, for an address.
During the years 1951, 1952 and 1953, the Bronx Red Book announced, to all who chose to look, that the Castle Hill Beach Club was a public bathing beach. Thus, in our opinion, all members of the public taking note of the listing could properly consider themselves invited to use the facilities. Any member of the general public, having noted this listing and having gone to the park, would find that admission for the season could be gained by merely paying the requisite charge for a season membership and completing a simple membership application form. His application had to be approved by the members’ governing committee but, as we have said, such approval was given as a matter of course to those not known to be disorderly persons.
Not until the commission had initiated the investigation of the petitioner did the membership corporation seek to surrender its public bathing establishment license, which it had applied for and received from the License Department of the City of *607 New York in 1951, 1952 and 1953. The membership corporation’s predecessor, Castle Hill Estate, Inc., had applied for and received the same type of license during each of the 23 years from 1928 through 1950. On March 31, 1953, when the alleged act of discrimination occurred; on April 6, 1953, when the complaint was filed; and on May 5, 1953, when the commission’s field representative questioned the membership corporation’s representatives about its licenses, the membership corporation had a public bathing establishment license.
The license which the membership corporation applied for and obtained from the State Liquor Authority in order to sell beer in its bar and cafeteria in 1951 and 1952 was a commercial beer license, the same kind of license held by its predecessor, Castle Hill Estate, Inc., when it owned and operated the park, and not a club license. In 1953, the lessee of the cafeteria and bar applied for and obtained a similar commercial beer license for said cafeteria and bar and not a club license.
Since its organization and through 1953, the membership corporation had paid the New York City gross business tax, just as any ordinary commercial business operated in the city of New York is required to do, and the membership corporation has no ruling exempting it from Federal income taxes, despite the fact that a bona fide club organized and operated for pleasure, recreation and other nonprofit purposes is entitled to such exemption under the Internal Revenue Code (U. S. Code, tit. 26, § 101, subd. [9]).
During each summer season, the Castle Hill Day Camp, located across the street from the park, utilizes the membership corporation’s pool and park facilities on a six-day per week basis with the knowledge and consent of the membership corporation and for which it is paid. The several hundred patrons of the day camp who are admitted to and utilize the membership corporation’s facilities are members of the public and are not required to be either seasonal members or guests of members of the membership corporation.
The commission has found, and the record supports the conclusion, that the creation of the membership corporation was motivated by apprehension of the possible effect which the presence of Negroes might have on the profit-making potential of the recreational park. The membership corporation’s president and general manager did not deny the statement attributed *608 to Mm by the commission’s field representative, “ Our only reason for not wanting to admit negroes is” that “we are seared to death to admit them for fear of the untoward results which might follow their admission.”
It may be that the telephone listing, etc., as isolated facts, do not justify the conclusion that the membership corporation was a mere sham designed to conceal the truly public nature of the enterprise. But, in our judgment, the record, considered as a whole, leads to that conclusion. The various aspects of a plan or scheme, when considered singly, may very well appear innocent. The true nature of the plan or scheme is revealed only when the various aspects are viewed as a totality. Such is this case.
Lastly, we find that the hearing conducted by the commission was fair and deprived the membership corporation of no constitutional right.
The order of the Appellate Division should be affirmed, with costs.
Desmond, Dye, Fuld, Froessel, Van Voorhis and Burke, JJ., concur.
Order affirmed.