Mrs. Noah **WRIGHT**, Plaintiff,

v.

The **CORK CLUB** et al., Defendants.

Civ. A. No. 67–H–706.

United States District Court,
S. D. Texas,
Houston Division.

Aug. 14, 1970.

Weldon H. Berry, Houston, Tex., Conrad K. Harper, New York City, for plaintiff.

Charles Kipple, Saccomanno, Clegg & Martin, Glenn H. McCarthy, Jr., Houston, Tex., for defendants.

*Memorandum and Order*

SINGLETON, District Judge.

Plaintiff, Mrs. Noah Wright, was denied membership in the Cork Club and the use of its facilities because she is a Negro. She brings this action against defendants, Cork Club, et al., seeking injunctive relief and claiming infringement of her rights under the Thirteenth and Fourteenth Amendments to the United States Constitution, the Commerce Clause (Art. I, Sec. 8, Cl. 3), Title II of the Civil Rights Act of 1964 (42 U.S.C. § 2000a *et seq.*), and 42 U.S.C. §§ 1981, 1982, and 1983. The parties have submitted this case to the Court on an agreed statement of facts, from which the following narrative is drawn.

In May, 1967, Ethel Banks, a Negro and a member of the Gamma Omega Chapter of the predominantly Negro Zeta Phi Sorority talked by telephone to defendant, Al Uhlenhoff, resident auditor of the Cork Club, regarding the possibility of the sorority's having a luncheon and style show at the Cork Club in October, 1967. Mrs. Banks explained at that time that neither the sorority nor any member thereof had membership in the Cork Club. Mr. Uhlenhoff was unaware of Mrs. Banks' race or the race of most Zeta Phi Beta members. She was assured by Mr. Uhlenhoff that membership was not necessary for use of the Cork Club's facilities and that the sorority members could be guests of defendant, Glenn H. McCarthy, president of the Cork Club. Mr. Uhlenhoff inquired whether any member of the sorority would like to become a member of the Club and volunteered to send Mrs. Banks application forms for that purpose. On May 29, 1967, Mr. Uhlenhoff mailed to Mrs. Banks a letter confirming the arrangements for the October luncheon and style show and enclosed several membership applications. Plaintiff filled out one of these applications, sent a check for $18.00, payable to the Cork Club, to cover one month's dues for a Class "A" member, and duly received her membership card.

On June 9, 1967, Mrs. Wright and Mr. and Mrs. Banks went to the Club for drinks. They were served. Mrs. Wright used her membership card and Mr. and Mrs. Banks were treated as guests of Mr. McCarthy. On June 14, 1967, Mrs. Wright and a friend were again served at the Club.

By a letter dated June 14, 1967, Mr. Uhlenhoff advised Mrs. Wright that "the matter of integration has never come before the membership of the Cork Club;" that the question of integration would be brought up at the next stated meeting in January, 1968; and that her membership card would not be active until the question was settled; Mr. Uhlenhoff also advised Mrs. Banks that the sorority's plans for a luncheon and style show at the Cork Club were cancelled. In June, 1967, a Negro physician resident in Houston, Dr. C. W. Thompson, applied for membership in the Club. By a letter dated June 20, 1967, Mr. Uhlenhoff returned Mr. Thompson's check in the amount of $18.00 "as the matter of integration has never come before the membership of the Cork Club, and, therefore, the membership committee at this time has no authority to act on your membership."

Except for Mrs. Wright, no Negro has ever been issued a membership card by the Cork Club. The sole ground upon which she was denied use of the Cork Club's facilities as a member was that the Cork Club did not wish to have Negro members. At a special meeting of the Class "A" members of the Cork Club on September 28, 1967, called for the single purpose of securing a vote on integration of the Club, 352 members voted against integration; 34 voted for integration; 8 were neutral.

The Cork Club is located on two floors of an office building on the edge of downtown Houston. The thirteenth floor, known as the Century Room, consists of a large dining room with a capacity of six hundred, where a fourteen piece orchestra appears regularly and "name" floor shows appear regularly. There are

two facilities on the fourteenth floor—the Clover Room [1] and the Brass Rail. The Brass Rail is promoted as a luncheon facility for businessmen.

The Cork Club came into being in 1949, when its initial charter was filed with the Secretary of State of the State of Texas. In 1966 the charter was amended and a Certificate of Restated Articles of Incorporation under the Texas Non-Profit Corporation Act was issued. The Charter provides for two types of membership—Class "A" and Class "B". The Class "A" members, who are residents of Harris County, Texas, have the right to vote, hold office, endorse membership applications, and amend the by-laws.[2] The Class "B" members may take advantage of all the Cork Club facilities, but play no role in the governing of the Club. A Class "B" member may be what is termed a company member. A company pays a monthly fee for the first five of its officers, then company memberships are made available to each employee or agent that the company specifies. Initiation fees have been established for each type of membership, but these are often waived. The monthly dues are $6.00 per month for Class "B" members, $18.00 per month for Class "A" members, and $54.00 per month for the company that sponsors "company members." In 1967 there were 946 Class "A" members and 1,918 Class "B" members.[3]

The Charter of the Cork Club also establishes a six member Board of Directors, who are elected for a one year term by an annual meeting of the Class "A" members.[4] Only Class "A" members can become directors. The Board of Directors must meet at least once a year following the Class "A" members' meeting. The Board of Directors may adopt rules for the Club, suspend or expel members for misconduct, and fix initiation fees and dues. The Board also elects the club officers—President, Vice President, Treasurer, and Secretary.[5]

The Board also has the duty of passing upon all applications for membership, but it may, and on past occasions has actually done so, delegate this duty to a Membership Committee composed of Glenn McCarthy, the president; William J. McCarthy, general manager,[6] and Mrs. Shirley Swiryn, the secretary of the Cork Club Corporation. The Membership Committee meets once a week to examine the list of prospective members and check credit references, if any. The membership list is approved when two members of the committee have signed it. The "usual" practice is for one to submit an application showing the recommendation of a member, although such recommendation is not always required. On approximately 430 occasions out of some 1500 applications examined, a membership card has been issued without prior consideration by the Membership Committee. When the Membership Committee does pass on the applications the criteria by which they are judged are: (a) good credit, (b) no substantial doubt about character, and (c) white race. The Club asserts that it does reserve the right to disapprove a person for membership or terminate his mem-

1. "[The Clover Room] has a glass enclosed lounge with landscaped terraces and fountains on the East and West sides; has a piano bar with a Latin combo * * *. This room has been styled to make it a prominent gathering place for those who may have seen the show and would like to have cocktails, dinner, and dance among the stars in the penthouse overlooking the beautiful panoramic view of glittering Houston." Exhibit D (Letter from Cork Club soliciting memberships among Houston area teachers).

2. See the Agreed Statement of Facts, Nos. 27 and 29 (A.S. 27, 29).

3. "Company members" are considered Class "B" members.

4. The record is unclear as to whether the Board is composed of five or six members. *Compare* A.S. 27 with A.S. 37.

5. The officers are: Glenn H. McCarthy—President; James A. Williams—Vice President and Treasurer; Shirley Swiryn—Secretary.

6. William J. McCarthy is the brother of Glenn McCarthy, the Club President.

bership privileges. Thus, even if an individual has not been passed on by the Committee, he is subject to some scrutiny. As is pointed out, "[i]f a member, and especially a Class 'A' member, had an objection to another member or an applicant such other member or applicant would have to be expelled or denied a membership.[7] Although the record indicates that some memberships have been terminated by the Board,[8] it does not indicate whether these terminations were the result of the objections of members or failure to pay dues or other bills.

Aside from the members, the Cork Club's facilities are used by guests of members or guests of the Club. Guest cards are issued only at the request of a member or at the request of the management of the Club. The facilities of the Club have been made available to individuals attending conventions in Houston.[9] They have been treated as guests of the management and could use the facilities on a "cash only" basis. This has been done on more than one occasion. The Club has sent form letters to Houston-area teachers offering them "cash only" memberships at a reduced rate and making no mention of initiation fees. It has also sent form letters to certain individuals soliciting applications for memberships. These solicitations have drawn responses and have resulted in new members for the Cork Club.[10]

The Cork Club has paid for advertisements in the daily Houston papers.[11] The advertisement that has been submitted into evidence is in the form of a salute to the Houston Livestock Show and Rodeo. However, prominent in the ad is a picture of the entertainer starring at the Cork Club during that week and the names of the two entertainers who would star at the Cork Club for the next two weeks. The ad gives the times of the shows and extends a general invitation to attend the shows. The telephone number of the Cork Club is given for those who wish to make reservations. The ad does not indicate that the invitation is limited to members and their guests.[12]

The Cork Club also has a working arrangement with the publisher of two magazines distributed in the Houston area, whereby he and his staff are permitted to use the Cork Club free of charge and, in return, ads for the Cork Club are run in his magazines. One of the magazines is intended for travelers and local residents. It is distributed free to all hotels, motels, most restaurants, ticket offices, apartment buildings, the airport, train, and bus stations. The other magazine is aimed at the "executive" in Houston. Both magazines are designed, among other things, to provide their readers with information about the available entertainment and dining facilities in Houston.[13]

The financial statements of the Cork Club reflect that it has made no net profit (net excess of income over expense) for any one of the years 1963, 1964, 1965, 1966, or 1967, but rather has sustained substantial losses (deficits) for each of those years. The Club has been exempted from the Federal income tax by virtue of the "Social Club" exemption, Int.Rev. Code § 501(c) (7), by determination let-

7. A.S. 29.

8. A.S. 29. The record does not indicate what Club machinery would be used to process one member's complaint about another member, or that anyone's membership has ever been terminated on that basis.

9. Arrangments were made between the Cork Club and officials of the organizations convening in Houston prior to the convention.

10. "The minutes of Class 'A' membership meetings reflect instances of a desire to solicit new members in order to improve the financial status of the Club." A.S. 32.

11. The Cork Club has also paid for ads in a Dallas daily newspaper.

12. Exhibit A.

13. The Club has also taken out ads in Polk's Houston City Directory (Exhibit B). It was listed in the June 1968 Greater Houston Yellow Pages under the heading "Clubs" not under the heading "Private Clubs."

ter from the District Director, Internal Revenue Service, effective June 8, 1966 and dated May 19, 1967. In addition, the Club holds Private Club Registration Permit No. 33743 issued by the Texas Liquor Control Board under article 666–15(e), Vernon's Texas Penal Code Annotated.

At a special meeting of the Board of Directors of November 21, 1960, it was resolved "that the contract between The Cork Club and Glenn H. McCarthy dated November 21, 1960, for a term of fifteen (15) years from December 1, 1960 to November 30, 1975, employing Glenn H. McCarthy as Managing Director of The Cork Club, and providing for compensation to Glenn H. McCarthy of fifteen per cent (15%) of the gross proceeds of The Cork Club, be ratified, authorized, and adopted in its entirety, as the act and deed of The Cork Club." This contract continued in effect until April 13, 1962 when it was amended to "limit" Mr. McCarthy's income to an amount determined by Certified Audit, but not less than $50,000.00 per year. On January 24, 1965, the contract was further amended to reduce the president's (McCarthy's) salary to $15,000.00 per year with an expense account not to exceed $10,000.00 per year. The amending resolution stated that "the President agreed to this, provided that if and when the earnings would permit, it would be reconsidered." In 1966, the "President's Commission" was $15,000.00, and in 1967 it was nothing.

Initially, plaintiff contends that the Cork Club is a place of public accommodations subject to the provisions of Title II of the Civil Rights Act of 1964, 42

U.S.C. § 2000a et seq.[14] Section 2000a, in part, provides:

"(b) Each of the following establishments * * * is a place of public accommodation within the meaning of this subchapter if its operations affect commerce, or if discrimination or segregation by it is supported by State action:

* * * * * *

"(2) any restaurant cafeteria, lunchroom, lunch counter, soda fountain, or other facility principally engaged in selling food for consumption on the premises, including, but not limited to, any such facility located on the premises of any retail establishment; * * *

"(3) any * * * place of exhibition or entertainment; * * *

* * * * * *

"(c) The operations of an establishment affect commerce within the meaning of this subchapter if * * * (2) in the case of an establishment described in paragraph (2) of subsection (b) of this section, it serves or offers to serve interstate travelers or a substantial portion of the food which it serves * * * has moved in commerce; (3) in the case of an establishment described in paragraph (3) of subsection (b) of this section, it customarily presents * * * performances, * * * exhibitions, or other sources of entertainment which move in commerce. * * * "

The agreed statement of facts reflects that a substantial amount of the food served at the Cork Club has moved in interstate commerce; that any food sold by the Cork Club is only for consumption on the Club's premises; that

14. Plaintiff also contends that even if this Court were to determine that defendant is a private club: (1) Defendant acting under color of law, has deprived plaintiff of rights secured to her by the Fourteenth Amendment to the United States Constitution; and (2) the equal right to make and enforce contracts and to have an interest in property, guaranteed by 42 U.S.C. §§ 1981 and 1982, includes the right to have access to the Cork Club and to be free from racial discrimination as a badge of slavery under the Thirteenth Amendment.
In view of this Court's ruling on plaintiff's first contention, it will not be necessary to pass on these other two contentions.

the Cork Club serves food to members or guests, some of whom are interstate travelers; that a number of the members of the Cork Club are not residents of the State of Texas; and, that the majority of the entertainers appearing at the Cork Club are from outside the State of Texas. These facts indicate a substantial effect on interstate commerce which would subject the Cork Club to the coverage of the public accommodations provisions of the Civil Rights Act of 1964. 42 U.S.C. §§ 2000a(b) (2) and (3), (c) (2) and (3) (1964). See Katzenbach v. McClung, 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964) (applying 42 U.S.C. § 2000a(b) (2) and (c) (2)); Fazzio Real Estate Co. v. Adams, 396 F.2d 146 (5th Cir. 1968); Miller v. Amusement Enterprises, Inc., 394 F.2d 342 (5th Cir. 1968) (*en banc*).

■ The Cork Club falls within the strictures of the Civil Rights Act of 1964, unless, as defendant contends, the Club is excluded from the Act's coverage by subsection (e). 42 U.S.C. § 2000a(e) (1964). Subsection (e) provides:

"(e) The provisions of this subchapter shall not apply to a private club or other establishment not in fact open to the public, except to the extent that the facilities of such establishment are made available to the customers or patrons of an establishment within the scope of subsection (b) of this section."

Thus, the applicability of the Civil Rights Act to defendant hinges upon a determination of whether defendant qualifies for private club status. The burden of proof is on defendant to substantiate its claim to private club status. United States v. Richberg, 398 F.2d 523 (5th Cir. 1968); Nesmith v. Y. M. C. A., 397 F.2d 96 (4th Cir. 1968); Kyles v. Paul, 263 F.Supp. 412 (E.D.Ark.1967).

The Civil Rights Act, itself, is of little value as a guide for determining whether a particular establishment qualifies as a private club. The statute sets forth a factual test of sorts—"not in fact open to the public,"[15] but it does not define "private club." The general intent and purpose of the Act was "to end discrimination in certain facilities open to the general public," and "to eliminate the inconvenience, unfairness and humiliation of racial discrimination." Miller v. Amusement Enterprises, Inc., *supra,* 394 F.2d at 349 and 353; United States by Katzenbach v. Clarksdale King & Anderson Co., 288 F.Supp. 792 (N.D.Miss. 1965). This is the extent of the guidance provided by the statute.

It is necessary to consult case law to resolve the question of what is a private club.[16] The cases reveal that there is no single definition of "private club." Courts consider a multitude of factors, no one of which is dispositive. Each factor is considered and either tips the balance for or against private club status. As the Court said in Nesmith v. Y. M. C. A., *supra:*

"In determining whether an establishment is in fact a private club, there is no single test. A number of variables must be examined in the light of the

---

15. The determination of whether an institution is a private club is a curious fact-law question. The United States Court of Appeals for the Fifth Circuit has spoken to this point, saying:
"Whether or not an institution is a 'club' within the meaning of section 201(e) is a question of law once the underlying facts have been determined. Such a determination is not an inference discoverable from 'experience with the mainspring of human conduct' * * * but an applicable legal standard whose dimensions must conform to the legislative purpose that prevailed at its inception.

Were this not so, the meaning of 'club' might change with each new case and the body of the Act fall victim to its own protean exception." United States v. Richberg, 398 F.2d 523 (5th Cir. 1968). *Richberg*, notwithstanding, there is no single definitive standard for determining private club status.

16. The decisions construing the federal statute are not very numerous. Thus, it is also necessary to consult state cases construing state public accommodations statutes with provisions similar to the federal statute.

Act's clear purpose of protecting only 'the genuine privacy of private clubs * * * whose membership is genuinely selective * * *." Nesmith v. Y. M. C. A., *supra*, 397 F.2d at 101–102.

Most of the decisions in this area have not involved close cases. Perhaps this is the reason courts have not felt compelled to develop a comprehensive definition of "private club." Two recent decisions by the United States Supreme Court fall into this category. Sullivan v. Little Hunting Park, Inc., 396 U.S. 229, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969); Daniel v. Paul, 395 U.S. 298, 89 S.Ct. 1697, 23 L.Ed.2d 318 (1969). In both cases the operations for which private club status was claimed were obvious shams. Thus, there was no detailed discussion of the question. In *Daniel* the Court described the alleged private club as follows: "It is simply a business operated for a profit with none of the attributes of self government and member-ownership traditionally associated with private clubs." Daniel v. Paul, *supra*, at 301, 89 S.Ct. at 1699. In *Sullivan,* the Court said of the operation involved: "There was no plan or purpose of exclusiveness. It is open to every white person within the geographic area there being no selective element other than race." Sullivan v. Little Hunting Park, 396 U.S. at 236, 90 S.Ct. at 404, 24 L.Ed.2d at 392. Thus, the Supreme Court decisions indicate that a private club is non-profit, member-owned and controlled, and selective as to membership and use of club facilities.

█ Courts have considered such factors as the club's finances, publicity, and the reasons for formation of the club.[17] While different courts have emphasized different factors, a common point of departure for all courts is an inquiry into the membership policies of the alleged private club. If a club is to be considered private, there must be some concern for how members are selected. Selectivity is the essence of a private club. A private club must have some basis for its selectivity and must have machinery whereby applications for membership are screened by members. If there is no established criteria for selecting members, the courts are reluctant to accept the claim of private club status, United States by Katzenbach v. Jack Sabin's Private Club, 265 F. Supp. 90 (E.D.La.1967).[18] If there is no club machinery for screening membership applications, United States by Katzenbach v. Jack Sabin's Private Club, *supra;* United States v. Northwest Louisiana Restaurant Club, 256 F.Supp. 151 (W.D.La.1966); Gillespie v. Lake Shore Golf Club, Inc., 91 N.E.2d 290 (Ohio Ct. App.1950); In re Holiday Sands, Inc., 9 Race Rel.L.Rep. 2025 (Ohio Civ.Rights Comm'n 1964), or if such machinery is ignored, United States v. Richberg, *supra;* United States by Katzenbach v. Clarksdale King & Anderson Co., 288 F.Supp. 792 (N.D.Miss.1965); Castle Hill Beach Club v. Arbury, 2 N.Y.2d 546, 162 N.Y.S.2d 1, 142 N.E.2d 186 (N.Y.Ct. App.1957), then private club status is not indicated.[19]

█ This element of selectivity also enters into the question of who is allowed to use the club's facilities. If the facilities which are sought to be integrated are regularly used by nonmem-

17. The legislative history of the Civil Rights Act of 1964 indicates that Congress intended that courts in applying the private club exemption not consider the reasons for the club's formation, if it were in fact not open to the public. Nesmith v. Y.M.C.A., *supra*, 397 F.2d at 102. See discussion, 30 Mont.L.Rev. 47, 54–5 (1968).

18. "The only stated qualifications for membership in the Regency Club are an application blank, $2.00, and white skin, for the officers who passed on membership could define these qualifications no more exactly than that." United States by Katzenbach v. Clarksdale King & Anderson Co., *supra*, 288 F.Supp. at 795.

19. Courts also consider the cost of membership as an indicator of private club status. The existence and amount of dues, Bradshaw v. Whigams, 11 Race Rel.L.Rep. 934 (S.D.Fla.1966), and initiation fees, United States by Katzenbach v. Clarksdale King & Anderson Co., *supra*, are considered.

bers, who are not bona fide guests of members, then the facilities cannot be said to be private. "A genuine private club limits the use of club facilities or services to members and bona fide guests." *Note*, 30 Mont.L.Rev., 47, 52 (1968). See United States by Katzenbach v. Jack Sabin's Private Club, *supra;* Castle Hill Beach Club v. Arbury, *supra;* Gillespie v. Lake Shore Golf Club, *supra.* It defeats the very purpose of a private club to allow the indiscriminate use of club facilities by nonmembers on a regular basis.[20]

■ The cases also discuss the factor of membership control of and participation in the activities of the "club." Thus, if the membership has a voice in formulating the policies of the "club," the balance is tipped in favor of club status. See Nesmith v. Y.M.C.A., *supra;* United States by Katzenbach v. Jack Sabin's Private Club, *supra.* An organization "can hardly be a private association where the members do not meet together." Nesmith v. Y. M. C. A., *supra,* 397 F.2d at 102. However, like most factors considered by the courts, evidence of membership participation is not dispositive. In Brackeen v. Ruhlman, 3 Race Rel.L.Rep. 45 (Ct.C.P.Pa.1957), the members kept minutes and records of their meetings, had a club newspaper, and held a skating revue, with the proceeds going to charity. Regardless, other factors pointed away from private club status. And, of course, no matter

how elaborate the organization and well defined the by-laws, if they are ignored in practice, they are of little value.

■ The finances of the club are also considered. If the club is operated for a profit; if it is a commercial enterprise operated for the benefit of one man or a small group, then it is not a private club. United States by Katzenbach v. Jack Sabin's Private Club, *supra;* Bradshaw v. Whigams, *supra.* Along this line, courts have considered the failure of organizations to claim the social club exemption under section 501(c) (7) of the Internal Revenue Code as indicating a lack of private club status. Bradshaw v. Whigams, *supra.*

■ Finally, courts have considered publicity and advertising in the usual advertising media as being inconsistent with a claim of private club status. This is particularly true where the advertising is designed to increase patronage of the clubs' facilities. United States by Katzenbach v. Jack Sabin's Private Club, *supra* (the ads "clearly invited the public"); Nesmith v. Y. M. C. A., *supra.* The court in Castle Hill Beach Club v. Arbury, *supra,* took into consideration the fact that the "club" was listed in the classified telephone directory under "Bathing Beaches—Public" rather than "Clubs."

■ None of these reported decisions contain a comprehensive definition of a private club.[21] Although it seems

---

20. It may be possible, particularly under the wording of some state public accommodation laws (e. g. Rev.Wash.Code § 9.91.010(1) (d) (1961)), for a private club to allow public use of some of its facilities and still retain the private club exemption. It is questionable whether this result is obtainable under the federal statute. Regardless, where the only reason for a club's existence is to use certain facilities and those facilities are regularly used by non-members, that club cannot qualify for the private club exemption. See discussion in Note 54 Geo.L.J. 915, 923–24 (1966).

21. One commentator has defined a private club as follows:

"A private club is an organization (1) formed because of a common associational interest among the members; (2) which carefully screens applicants for membership and selects new members with reference to the common intimacy of association; (3) which limits the facilities or the services of the organization strictly to members and bona fide guests; (4) which is controlled by the membership in general meetings; (5) which limits its membership to a number small enough to allow full membership participation and to insure that all members share the common associational bond; (6) which is non-profit and operated solely for the benefit of the mem-

clear that each case within this area must be decided in its own particular setting and factual background and within the context of the entire record before the Court, still this Court believes it helpful to enumerate certain minimum standards that should be met by any organization to come within private club exemption provided for in 42 U.S.C. § 2000a(e). Such minimum standards would be as follows:

(1) An organization which has permanent machinery established to carefully screen applicants for membership and who selects or rejects such applicants on any basis or no basis at all; (2) which limits the use of the facilities and the services of the organization strictly to members and bona fide guests of members in good standing; (3) which organization is controlled by the membership either in the form of general meetings or in some organizational form that would and does permit the members to select and elect those member officers who control and direct the organization; (4) which organization is non-profit and operated solely for the benefit and pleasure of the members; and (5) whose publicity, if any, is directed solely and only to members for their information and guidance.

This Court adopts the above definition as setting forth in a comprehensive manner the factors determinative of "private club" status. Having reviewed the facts of the present case, in light of these enumerated minimum standards, this Court can reach no conclusion other than that the Cork Club does not meet any one, much less all, of these enumerated minimum standards and therefore falls short of being afforded private club status.

■ The fact that the Cork Club has been exempted from the Federal Income tax by virtue of the "Social Club" exemption is of little evidentiary value in this matter. This determination by the District Director was not made in a contested proceeding. This Court does not know what amount of fact finding he did, nor what factors he considered. Regardless, this Court is charged with the duty of making an independent determination in light of the purposes of the public accommodations provisions of the Civil Rights Act of 1964.

■ In a similar vein, the fact that the Cork Club qualifies as a "private club" under the Texas Liquor Control Act, Tex.Penal Code Ann., art. 666–15 (e), is not persuasive. This Court is familiar with the hypocrisy of the Texas liquor laws, and knows that often what are termed "private clubs" under these laws are nothing more than commercial ventures. Texans are forbidden by their state constitution to operate "open saloons."[22] Thus, so-called "private clubs" have been established to dispense liquor-by-the-drink to Texans. Some of these establishments may qualify as "private clubs" under the Civil Rights Act, others may not. But the mere appending of the appellation "private club" to these establishments under the Texas Liquor Control Act will not suffice to determine the issue as far as the Civil Rights Act is concerned. The record submitted by the parties does not dwell on a discussion of the Texas liquor laws, but this Court, sitting in Texas, cannot ignore a matter which is of common knowledge to Texans.

"Besides, we cannot shut our eyes to matters of public notoriety and general cognizance. When we take our seats on the bench we are not struck with blindness, and forbidden to know as judges what we see as men

bers; and (7) whose publicity, if any, is directed only to members for their information." Note, 30 Mont.L.Rev. 47, 58 (1968).

22. The Texas Constitution, article 16, section 20, as amended in 1935, Vernon's Ann.St., provides:

"(a) The open saloon shall be and is hereby prohibited. The Legislature shall have the power, and it shall be its duty to define the term 'open saloon' and enact laws against such."

* * *." Ho Ah Kow v. Nunan, 12 Fed.Cas.No.6,546, pp. 252, 255 (C.C.D. Cal.1879) (Field, Jr.), quoted in Miller v. Amusement Enterprises, Inc., 394 F.2d 342, 349 (5th Cir. 1969) (*en banc*).

Admittedly, the Cork Club was formed to comply with the requirements of the Texas Liquor Control Act. It was not designed to evade the proscriptions of the Civil Rights Act. In Texas, in 1949, segregation of public accommodations was the rule. There was no need to form a private club in order to avoid integration. However, the fact that the Cork Club has been in operation for many years prior to the passage of the Civil Rights Act will not foreclose an inquiry into its "private club" status.

"The fact that the *modus vivendi* of the organization has been the same in past years and is not a recently devised subterfuge to circumvent the 1964 Act is irrelevant. As Senator Long stated, the force of the exemption 'does not relate to whatever purpose or animus the organizers may have had in mind when they brought the organization into existence.'" Nesmith v. Y. M. C. A., *supra*, 397 F.2d at 102.

The lax membership policies of the Cork Club provide further evidence of this lack of selectivity of its members. While the Cork Club has some of the trappings of a "private club," it is in fact open to white people generally and only occasionally are good credit and good character required. The Cork Club does not carefully screen applications for membership and, although it does have a permanent machinery set forth in the by-laws to select or reject

new members, such machinery is not used in any real sense that would involve a careful selection process. Approval of the applications by the membership committee is a pro forma activity, and, in fact, in more than a quarter of the situations examined membership cards were sent to applicants without prior screening by the membership committee. There is no evidence of any interviews with prospective members by the membership committee, nor of any efforts or procedures for checking the "good character" of the applicant, which is said to be required.[23]

Further evidencing this lack of selectivity on the part of the Cork Club is the wholesale solicitation of applications from groups such as teachers and the sending of form letters to other individuals soliciting applications. On two occasions membership cards were mailed to applicants on the same day the applications were received.[24] There is ample evidence that membership in the Cork Club is obtained simply by requesting it and paying the appropriate dues. The detailed provisions of the Cork Club Charter and By-Laws are for naught. Indeed, the very facts which give rise to this suit support this conclusion. Plaintiff knew no members of the Cork Club nor was her application sponsored by a Cork Club member.[25] She merely paid the first month's dues and received her "Class A" membership card.[26] Plaintiff's experience does not appear to be atypical.

The Cork Club is not an organization which limits the use of its facilities or services strictly to members and bona fide guests. The Cork Club's facilities are regularly used by nonmembers who are not bona fide guests of members.

---

23. The record reveals a practice of ignoring the requirement that prospective members be sponsored by present members. In fact, the membership application placed in evidence does not indicate a sponsor. (Exhibit K)

24. Exhibits D and E.

25. On some occasions companies act as guarantors and sponsors of Cork Club

memberships for their employees and agents. This again is indicative of the lack of any requirement of personal association with Cork Club members in order to become a member of the Cork Club.

26. There is nothing in the record to indicate that receiving a membership card is not synonymous with becoming a member.

This is exemplified by the extension of guest card privileges on a "cash only" basis to large groups of people attending conventions in Houston.[27] There is no evidence that any of these people were known to any members of the Cork Club. Lax guest card practices have been the hallmark of so-called "private clubs" in Texas, and defendant does not appear to be an exception.[28] The experience of plaintiff's friends appear to bear this out. When seeking to make arrangements for their sorority functions, they were told they did not have to know a Cork Club member in order to make use of the Club's facilities. They could be guests of Mr. McCarthy, the club president, a man they obviously did not know. Again, when Mr. and Mrs. Banks accompanied plaintiff to the Cork Club, they were served as guests of Mr. McCarthy. This practice of admitting people as guests of McCarthy is obviously a sham device used to hide the fact that the Cork Club is generally open to people who are not bona fide guests.

The Class "A" members of the Cork Club meet annually and the minutes of these meetings have been recorded. The Class "A" members elect the Board of Directors, who in turn elect the officers. Ostensibly, the Cork Club is controlled by the Class "A" membership. However, this apparent membership control is called into question by the somewhat ill-defined role of Mr. Glenn McCarthy. McCarthy's name is associated with the Cork Club in much the same way any private entrepreneur's name would be associated with his establishment. The advertisement in the newspaper prominently displays McCarthy's name. Members of the general public are admitted to the Cork Club as guests of McCarthy. Thus, plaintiff's reference in her brief to "Glenn McCarthy's Cork Club" is understandable.

Mr. McCarthy's dominant role in the Cork Club is further illustrated by his financial arrangements with the Club. The Cork Club Charter provides:

"[N]o part of * * * the Club's assets, whether income or principal, shall ever inure to the benefit of any director, officer or employee of the corporation or of any individual having a personal or private interest in the activities of the corporation; nor shall any director, officer, employee, or individual receive or be lawfully entitled to receive any profit from the operations of the corporation except a reasonable allowance for compensation for services actually rendered. * * * " (A.S. 26).

In the face of this charter provision the club has continued in effect a contract which would give McCarthy fifteen per cent (15%) of the gross proceeds of the Club for fifteen (15) years. Later the contract was modified to guarantee McCarthy $50,000.00 per year. McCarthy later agreed to a reduction of the salary to $15,000.00 per year and a $10,000.00 per year expense account. Initially, McCarthy was employed as the "Managing Director." The record does not reveal the extent of his duties. All during this period McCarthy's brother has been "manager" of the Cork Club. McCarthy is now designated "president" of the Cork Club. The contract paying him $15,000.00 per year as president of the Cork Club is in effect today, and by its terms will continue in effect until 1975. Thus, even though theoretically the Class "A" members could elect a new Board of Directors each year, who could in turn elect a new president—the Club has entered into a long-term contract with one man, providing him with compensation as president.

This Court is well aware that any organization, be it a legitimate private club,

---

27. One advantage of a membership over a "guest card" would seem to be the extension of credit to members. Hence, the requirement of "good credit" to become a member. However, it has been seen that memberships are occasionally extended to groups of people on a "cash only" basis, with the dues being reduced. (Exhibit D).

28. See text accompanying note 21, *supra.*

a business, or a government agency, is likely to have its day-to-day decisions made by relatively few people. This Court also recognizes that some legitimate private clubs pay their managers or officers a reasonable salary for their services. But McCarthy's financial arrangements with the Cork Club are such as can fairly be described as profit-making. The Cork Club, in all of its features material to the matters involved here, is operated as any other commercial enterprise serving the public in the area of food, refreshments, and entertainment.

Further illustrating the commercial nature of the Cork Club is the publicity the Cork Club has sought in the usual advertising media. Performers appearing at the Cork Club promote club shows on local radio and television programs. The Cork Club buys ads in the Houston and Dallas newspapers. These ads are placed on the entertainment pages of the newspapers. They constitute a general invitation to the public to attend the Cork Club. Defendant contends that the ads could be interpreted merely as a means of informing Cork Club members of Club activities. The appearance of the ad is that of a regular entertainment ad. There is nothing whatsoever in the ad, which limits it to members only. Defendant points out that the ad solicits reservations. Thus, defendant contends that when nonmembers call for reservations they are informed of the private nature of the Cork Club. The record before this Court indicates quite the contrary practice.

When considered individually no one of the above factors may be persuasive as to the Cork Club's status, but when the status of the Cork Club is viewed within its own particular setting and the factual background surrounding its creation and its continued operation and viewed within the context of the entire record before this Court, there can be no doubt but that the Cork Club does not qualify for the private club exemption provided for in 42 U.S.C. § 2000a(e). The Cork Club is a place of public ac-

commodation described in 42 U.S.C. § 2000a(b)(2) and (3) and (c)(2) and (3).

The only purpose of the "private club" format when it was adopted by the Cork Club was to enable it to sell mixed drinks. Thus, the Cork Club has characterized itself as a "private club" as an accommodation to the outmoded hypocritical liquor laws of the State of Texas. The Cork Club now seeks to further this perversion of the term "private club" by using it as a device to prevent integration of facilities which are for all legal and practical purposes open to the public.

If this Court were not completely convinced from the record before it of the Cork Club's status as a place of public accommodation this Court would uphold the racial restrictions involved, because this Court agrees with Justice Goldberg when he said:

"Prejudice and bigotry in any form are regrettable, but it is the constitutional right of every person to close his home or club to any person or to choose his social intimates and business partners solely on the basis of his personal prejudices including race. These and other rights pertaining to privacy and private association are themselves constitutionally protected liberties." Bell v. Maryland, 378 U.S. 226, 313, 84 S.Ct. 1814, 1862, 12 L.Ed.2d 822 (1964) (concurring opinion).

However, the Cork Club is a place of public accommodation, a commercial venture, and is generally open to the white public and its form is dictated by the requirements of the Texas Liquor Control Act rather than any passion for privacy.

In conclusion, to make it perfectly clear, the Court wishes to reiterate that any truly private organization or association, such as a country club, a social club, a business partnership, or a political association would be beyond the bounds of government regulation with regard to membership. More often than not the resolution of constitutional disputes is accomplished, not by the application of absolute rules, but by a balancing

process. The cause of racial integration is a laudable one indeed. But to allow the government to intrude into the essentially private affairs of men, even in the name of integration, would work a greater injustice to all citizens, no matter what may be their race, creed, or religion.

To allow such a governmental intrusion would violate not only the First Amendment, but the very essence of the Bill of Rights. The Bill of Rights stands for the proposition that there are bounds beyond which the government cannot go in interfering with individual rights. The Supreme Court in numerous past decisions has drawn the lines establishing the metes and bounds of governmental authority. See, e. g., Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) (privacy of marriage) and cases cited therein. See also Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (privacy of conversations); Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) (privacy of home); N.A.A.C.P. v. Alabama, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958) (privacy of association). Foremost among the protected areas is the privacy of the individual, in his home, in his private associations, and even in the very words which he utters in private. The Bill of Rights, though it does not say it in so many words, guarantees to every individual the basic right of privacy. In essence, when the courts protect the individual from governmental interference with his right of assembly or freedom of speech and press, protect him from unreasonable searches and seizures or from being forced to incriminate himself, they are protecting his integrity and privacy as an individual. Underlying the specific guarantees of the Bill of Rights is a basic concern for the integrity and privacy of the individual.

As the Supreme Court said in Griswold v. Connecticut, 381 U.S. 479, 483, 85 S.Ct. 1678, 1681, 14 L.Ed.2d 510 (1965):

" * * * In other words, the First Amendment has a penumbra where privacy is protected from governmental intrusion. In like context, we have protected forms of 'association' that are not political in the customary sense but pertain to the social, legal and economic benefit of the members * * *.

" * * * The right of 'association,' like the right of belief ([West Virginia State] Board of Education v. Barnette, 319 U.S. 624, [63 S.Ct. 1178, 87 L.Ed. 1628]), is more than the right to attend a meeting; it includes the right to express one's attitudes or philosophies by membership in a group or by affiliation with it or by other lawful means. Association in that context is a form of expression of opinion; and while it is not expressly included in the First Amendment its existence is necessary in making the express guarantees fully meaningful."

Thus, before Title II of the Civil Rights Act can be applied to a so-called "private club," a Court must determine, as this Court has done, that the organization is not in fact a private club. In this Court's view, governmental regulation of the membership of private clubs is beyond the pale of governmental authority. If the government were allowed to regulate the membership of truly private clubs, private organizations, or private associations, then it could determine for each citizen who would be his personal friends and what would be his private associations, and the Bill of Rights would be for naught.

Therefore, for the reasons stated above, the injunctive relief sought should be granted.