The UNITED STATES JAYCEES,
Appellants,

v.

Marilyn E. McCLURE, Warren Spannaus, and George A. Beck, Respondents.

No. 51171.

Supreme Court of Minnesota.

May 8, 1981.

 

Mackall, Crounse & Moore and Clay R. Moore, Minneapolis, Hall, Sublett, McCormick & Andrew and Carl D. Hall, Jr., Tulsa, Okl., for appellants.

Warren Spannaus, Atty. Gen., and Richard L. Varco, Jr., Sp. Asst. Atty. Gen., St. Paul, for respondents.

Lynn Hecht Schafran, New York City, Phyllis N. Segal, Kim E. Greene, and Judith I. Avner, NOW Legal Defense and Education Fund, New York City, for amicus curiae.

OTIS, Justice.

The United States District Court for the District of Minnesota has certified the following question to this court, in conformity with Minn.Stat. § 480.061(3) (1980): "Is the United States Jaycees 'a place of public accommodation' within the meaning of Minn.Stat. § 363.01 Subdivision 18?" We answer in the affirmative.

The case and question arise from a dispute between a national organization and two of its local affiliates. Their dispute concerns an admittedly unequal granting of the privileges of membership. The national organization has settled on a policy that admits women to membership, but with the proviso that women shall not be accorded privileges that are full and equal to those accorded to men. The policy is effected by a distinction in the kinds of membership offered. Individual membership is offered to men, ages 18 to 35, in exchange for annual membership dues. Associate individual membership [hereafter "associate membership"] is offered to a business concern, association, group or individual not qualified by the by-laws to be an individual member. The annual dues charge is a few dollars less than the charge for an individual membership. Women, by definition, may be offered only associate membership.

The difference in the dues charged for those memberships is small; the difference in the privileges accorded is considerable. Associate members are not allowed to stand or be nominated for office; they are not allowed to vote in such elections, nor vote on any other matters of decision in the local, state, or national organizations; and, though women are allowed to participate in many of the programs of the organization and contribute their time and effort toward making those programs successful, women are not allowed to be the recipients of any of the numerous achievement awards given by the local, state and national organizations. The awards and the prestige are restricted to men. Men continue to receive awards even when, after age 35, they can only purchase the otherwise same associate membership as women.

This membership policy has not met with the approval of the organization's Minneapolis and St. Paul chapters. In 1974, the Minneapolis chapter began to allow women to purchase individual memberships, and accorded them privileges that were full and equal to those accorded to men. In 1975, the St. Paul chapter made the same change. The national organization, however, voted down an amendment to its by-laws that would have allowed individual memberships to be sold to women. The organization decided, instead, to set up a "pilot membership program". Local chapters in five states could let women purchase individual memberships. Only three of the affiliated state organizations voted to let their local chapters try the pilot program. The affiliated state organization in Minnesota voted not to try it. In June 1978, the president of the national organization ordered the pilot programs terminated. The national organization repeated its rejection of the proposed change in its policy of letting women purchase only an associate membership, costing a few dollars less but worth much less than

the individual memberships that men could buy.

By letter, the national organization advised the Minneapolis and St. Paul chapters of its imminent plans to vote on whether to revoke their respective charters because those Minnesota chapters had violated the organization's by-laws by continuing to let women purchase individual memberships. On the previous day, December 14, 1978, the Minneapolis and St. Paul chapters brought before the Minnesota Department of Human Rights a charge of sexual discrimination against the national organization. They alleged violations of Minn.Stat. § 363.-03(3), (6) (1980). The commissioner of the department investigated and found probable cause that there was a violation. The department attempted without success to conciliate the matter.

On October 9, 1979, a State Hearing Examiner found the national organization in violation of Minn.Stat. § 363.03(3) (1980), the pertinent part of which reads:

> It is an unfair discriminatory practice:
>
> To deny any person the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of a place of public accommodation because of race, color, creed, religion, disability, national origin or sex.

The Examiner held that the national organization discriminated unfairly on the basis of sex by refusing to let women purchase individual memberships. He enjoined the national organization from such discrimination in any of its chapter affiliates within Minnesota, and from taking sanctions against any of them for selling individual memberships to women.

The national organization responded with a petition for review of the Examiner's order to the Ramsey County District Court, and commenced an action, in the United States District Court for the State of Minnesota, for the purpose of reserving determination of federal constitutional claims arising from the application of Minn.Stat. § 363.03(3) (1980). The federal district court, in an attempt to expedite a decision of the pivotal issue, certified to this court the question of whether this national organization is a " 'place of public accommodation' within the meaning of Minn.Stat. § 363.01, Subdivision 18?"

*Legislative guidance*

In Minn.Stat. § 363.01(18) (1980) the legislature expressed its own special and unusually broad definition of the term "place of public accommodation": "a business, accommodation, refreshment, entertainment, recreation, or transportation facility of any kind, whether licensed or not, whose goods, services, facilities, privileges, advantages, or accommodations are extended, offered, sold, or otherwise made available to the public." The legislature defines a term only because it intends in some measure to depart from the ordinary sense of that term. Thus, there is a presumption that we are not to substitute the literal, ordinary meaning of "place of public accommodation" for the definition the legislature has provided.

The legislature has, moreover, cautioned us against narrowly construing any of the provisions of Minn.Stat. § 363.03 (1980). It has broadened the term "place of public accommodation" to mean "a business * * * facility of any kind * * * whose goods * * [and] privileges * * * are sold, or otherwise made available to the public". Minn.Stat. § 363.01(18) (1980). It has also expressly required a broad construction of all provisions of the statute by order of Minn.Stat. § 363.11 (1980) which reads, in pertinent part: "The provisions of this chapter shall be construed liberally for the accomplishment of the purposes thereof." Minn.Stat. § 363.12 (1980) states those purposes to be "to secure for persons in this state, freedom from discrimination * * *." To understand accurately what those purposes here require in a construction of Minn.Stat. § 363.01(18) (1980), we must review the history of that provision and of Minn.Stat. § 363.03(3) (1980) whose key term it defines.

*Legislative history*

In 1885, ten years before the United States Supreme Court put its imprimatur on the "separate but equal" fiction justify-

ing the Jim Crow laws, the legislature of the State of Minnesota chose a different course, that of "full and equal" privileges, as it enacted this statute:

> That all persons within the jurisdiction of the state of Minnesota shall be entitled to the full and equal enjoyment of the accommodations, advantages, facilities and privileges of inns, public conveyances on land or water, theatres and places of public amusements, restaurants and barber shops, subject only to the conditions and limitations established by law and applicable alike to all citizens of every race and color, regardless of any previous condition of servitude.[1]

In 1897, the legislature broadened the scope of the statute by increasing the number and kind of enumerated sites on which a person would be held to have violated the statute if that person excluded

> any other person within the jurisdiction of the state of Minnesota, on account of race, color or previous condition of servitude, from the full and equal enjoyment of any accommodation, advantage, facility or privilege, furnished by innkeepers, hotel keepers, managers or lessees, common carriers or by owners, managers or lessees of theaters or other places of amusement, or public conveyance on land or water, restaurants, barbershops, eating houses, *or other places of public resort, refreshment*, accommodation or entertainment, or

> Denies, or aids or incites another to deny any other person because of race, creed or color, or previous condition of servitude, the full and equal enjoyment of any of the accommodations, advantages, facilities and privileges of any hotel, inn, tavern, restaurant, eating house,

soda water fountain, ice cream parlor, public conveyance on land or water, theater, barbershop *or other place of public refreshment*, amusement, instruction, accommodation or entertainment, * * *.[2]

We note that the legislature intended the statute to be applied to both fixed sites (e. g., hotels and restaurants) and mobile sites (e. g., public conveyances). Such sites were not to be limited to those enumerated, but were to include "other places of public * * refreshment * * *."

This court held, in 1898, that the anti-discrimination statute had not been violated when a saloon keeper refused to sell a glass of beer to a former slave, solely because of that customer's race and color. *Rhone v. Loomis*, 74 Minn. 200, 77 N.W. 31 (1898). Within a year the legislature overruled that narrow construction with an amendment that added "saloons" to the enumerated list of fixed and mobile sites.[3]

In 1905, the legislature simplified the statute, deleting enumerated kinds of managers (e. g., hotel keepers), retaining most of the enumerated kinds of fixed and mobile sites and the broadly inclusive provision as to "other places of refreshment, entertainment, or accommodation." Minn.Rev. Laws (1905) ch. 55, § 2812.[4] In 1943 the legislature again extended the scope of the statute, amending it to prohibit discrimination based on "national origin or religion."[5]

In 1965, the legislature split the anti-discrimination in public accommodations statute, leaving in one statute the description of what constituted prohibited discrimination, Minn.Stat. § 327.09 (1965), and shifting the actual prohibition to subdivision 3 of a new, unfair discriminatory practices stat-

---

1. Act of March 7, 1885, ch. 224, § 1, 1885 Minn.Laws 295, 296.

2. Act of April 23, 1897, ch. 349, §§ 2–3, 1897 Minn.Laws 616 (emphases added).

3. Act of March 6, 1899, ch. 41, § 1, 1899 Minn. Laws 38, 38–39.

4. Minn.Rev.Laws ch. 55 (1905) provided in pertinent part that: "No person shall be excluded, on account of race or color, from full and equal enjoyment of any accommodation, advantage, or privilege furnished by public conveyances, theaters, or other public places of amusement, or by hotels, barber shops, saloons, restaurants, or other places of refreshment, entertainment, or accommodation."

5. Act of April 23, 1943, ch. 579, § 7321, 1943 Minn.Laws 831, 832.

ute, Minn.Stat. § 363.03 (1965).[6] Thus, Minn.Stat. § 363.03(3) (1965) read: *"Public accommodation :* (1) It is unfair discriminatory practice for any person to engage in an act forbidden by Minnesota Statutes 1961, Section 327.09." In 1967, the legislature revised subdivision 3; instead of prohibiting acts forbidden by Minn.Stat. § 327.09 (1967), it now had its own description of unfair discrimination that it prohibited within a scope far broader than that of the other statute, still in force, to which it had originally been attached and to which it had subsequently referred.[7] The broadening of that scope is best seen by a comparison of the two statutes. The older retained statute, Minn.Stat. § 327.09, (1967) reads:

> No person shall be excluded, on account of race, color, national origin, or religion from full and equal enjoyment of any accommodation, advantage, or privilege furnished by public conveyances, theaters, or other public places of amusement, or by hotels, barber shops, saloons, restaurants, or other places of refreshments, entertainment, or accommodations.

The newer statute, Minn.Stat. § 363.03(3) (1967), reads:

> Public accommodations. It is an unfair discriminatory practice:
>
> To deny an individual or group of individuals the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of a place of public accommodation because of race, color, creed, religion, or national origin.

Both statutes prohibit the discriminatory denial of the full and equal enjoyment of advantages and privileges of certain kinds of sites. The older statute enumerated some of those kinds of sites, fixed and mobile. The new statute expanded that scope; it added to the prohibitions the discriminatory denial of the full and equal enjoyment of goods, services, and facilities; it encompassed more than the previous kinds of sites, for the legislature used not an enu-

merated list, but one broadly inclusive term —"place of public accommodation"—and the legislature defined that term to mean: "a business * * * facility of any kind * * * whose goods * * * [and] privileges * * * are extended, offered, sold, or otherwise made available to the public." Minn.Stat. § 363.01(18) (1967).

Thus, while the older statute contemplated only certain fixed and mobile sites, the new statute encompasses a "business facility of any kind," whether fixed or mobile. While the older statute concentrated on the kinds of sites where discrimination would be prohibited, the new statute focuses on *conduct* in which discrimination would be prohibited and thus speaks not of a business facility *where* goods and privileges are offered, but rather, of "a business * * * facility of any kind * * * *whose* goods * * * [and] privileges are * * * offered, sold, or otherwise made available to the public." Minn.Stat. § 363.01(18) (1967) (emphasis added). The question for decision is whether that statutory definition encompasses the national organization now before this court. We turn to examine that organization.

*Characteristics and practices of the national organization*

Our examination of the national organization (and its local affiliates) proceeds along three lines set out in Minn.Stat. § 363.01(18) (1980): (1) is the national organization a *business* in that it sells goods and extends privileges in exchange for annual membership dues?; (2) is the national organization a *public* business in that it solicits and recruits dues paying members but is unselective in admitting them?; and (3) is the national organization a public business *facility* in that it continuously recruits and sells memberships at sites within the State of Minnesota? The record before us clearly reveals that the answers to those questions are affirmative.

We address first whether the national organization is a *business.* The national

---

6. Act of May 21, 1965, ch. 585, 1965 Minn.Laws 854; Act of May 21, 1965, ch. 586, 1965 Minn. Laws 854.

7. Act of May 25, 1967, ch. 897, § 14, 1967 Minn.Laws 1932, 1938.

organization urges this court to draw a distinction between an organization's internal activities (e. g., membership dues) and its external activities (e. g., inviting the public to participate in the organization and the activities it conducts). With this distinction the national organization contends that membership in it is equivalent to ownership of the organization; it then concludes that ownership, or a share of ownership of an organization, is beyond the scope of Minn.Stat. § 363.01(18) (1980), for that subdivision concerns only the goods and privileges offered or sold to the public by a business, and does not concern its ownership.

To be substantiated, the analogy would have to be borne out, in the record, by the way the national organization regards its current and prospective members, i. e. as its present and potential owners, rather than as its customers. The record before us reveals a national organization that regards its members more as customers than as owners. The national organization's *Officers' & Directors' Guide 1978–79* refers to members as the officers' "customers." (Exhibit 6, p. 27). The national organization's *Recruitment Manual* has this preface to its recommended sales approach to prospective members: "JAYCEES, THE PRODUCT you are selling, is outstanding from any angle. *Jaycees is the 'best value' you can get.*" (Exhibit 24, p. 5) (emphasis in original). The *Recruitment Manual* cautions that "[o]nce a young man becomes a member, the responsibility to deliver the goods you sold him begins." (Exhibit 24, p. 1). The national organization's *Regional Director's Handbook 1977–78* discusses "How to Sell Jaycees" and reminds the directors to "Know your product." (Exhibit 44, p. 21).

The product being sold is membership in an organization whose aim is the advancement of its members. Thus, the national organization's *Chapter President's Management Handbook 1977–78* reminds the presidents of their responsibility to ensure that those holding individual memberships "will indeed have a slight edge in life over the non-Jaycee * * *." (Exhibit 2, p. 36). This "edge" that members obtain takes several forms. The president of the national organization, in letters published in *Future* (the official publication of the organization), maintains that it is "the greatest young men's leadership-training organization * * *." *Future*, Jan.-Feb. 1979, at 4 (Exhibit 55); *Future*, March-April 1979, at 5 (Exhibit 54). The organization asks business firms to pay the dues of individual memberships for a number of their employees; the fact that firms often do so suggests that those employees are viewed by their firms as receiving an edge, and that may help them when they are considered for promotion. Those holding individual memberships and who become officers in the organization thereby receive enhanced leadership experience and enjoy the enhanced privileges and advantages of making contacts with others, often business contacts. In this regard we note that the national organization has successfully sued under the trade-mark laws to have one of its disaffiliated chapters enjoined from infringing on its name and from engaging in unfair competition with the national organization, *United States Jaycees v. San Francisco Junior Chamber of Commerce*, 513 F.2d 1226 (9th Cir. 1975); the concurring opinion of Judge Ely observed that "it seems clear that the term 'Junior Chamber of Commerce' does refer to the specific source of a 'product' (the National/Jaycees) * * *." *Id.*

By virtue of its sale of individual memberships (with the accompanying goods and privileges) the national organization is a *business.*

Is the national organization a *public* business? The national organization contends that it is a private organization; its brief cites three decisions by Circuit Courts of Appeal and claims that these upheld the non-public character of the national organization. *See New York City Jaycees, Inc. v. United States Jaycees, Inc.*, 512 F.2d 856 (2d Cir. 1975); *Junior Chamber of Commerce v. Missouri State Junior Chamber of Commerce*, 508 F.2d 1031 (8th Cir. 1975); *Junior Chamber of Commerce of Rochester,*

*Inc. v. United States Jaycees,* 495 F.2d 883 (10th Cir.) *cert. denied,* 419 U.S. 1026, 95 S.Ct. 505, 42 L.Ed.2d 301 (1974). Those decisions, however, are inapposite. In each of them the issue was whether the national organization's receipt of federal funds and its status as a tax exempt organization constituted state action sufficient to subject it to scrutiny under a federal constitutional standard. All three circuit courts answered that question in the negative. To hold, however, that by such activities the national organization is not an entity of state action is far from holding that it is a private organization, and, in fact, gives no insight to the construction of the statute in controversy.

The national organization contends that the most relevant reported case is the Oregon Supreme Court's decision that Cub Scouts were not within the definition of a "place of public accommodation," and, therefore, could exclude girls from membership. *Schwenk v. Boy Scouts of America,* 275 Or. 327, 551 P.2d 465 (1976). Because of its reasoning, the decision is irrelevant to the present controversy. The Oregon Supreme Court conceded that the Boy Scouts of America may not be a "distinctly private" club so as to come within the Oregon statute's exemption of private clubs. 275 Or. at 335, 551 P.2d at 469.[8] The court relied almost entirely on the statute's legislative history that showed that there was some doubt as to whether the Y.M.C.A. and the Y.W.C.A. were "places of public accommodation." The court reasoned, then, that

by analogy the Oregon Public Accommodation Act was not intended "to include the Boy Scouts of America, at least to the extent of requiring it to accept applications by girls for membership." 275 Or. at 336, 551 P.2d at 469. The statute in controversy here has a quite different legislative history. Therefore, the Supreme Court of Oregon's decision in *Schwenk* provides neither analogy for nor insight into the question before this court.[9]

There are, however, cases that provide criteria for deciding, in the context of a public accommodation statute, whether a group is private or public. *See Nesmith v. Young Men's Christian Association,* 397 F.2d 96 (4th Cir. 1968); *Cornelius v. Benevolent Protective Order of Elks,* 382 F.Supp. 1182 (D.Conn.1974); *Wright v. Cork Club,* 315 F.Supp. 1143 (S.D.Tex.1970). Two criteria tend to be used: (1) the selectiveness of the group in the admission of members, i. e., standards and a formal procedure by which membership is restricted; and (2) the existence of limits on the size of the membership. *See Nesmith,* 397 F.2d at 102; *Cornelius,* 382 F.Supp. at 1203; *Wright,* 315 F.Supp. at 1153.

The national organization would have us disregard these clear standards, or to observe, instead, that Minn.Stat. § 363.01(18) (1980) makes no mention of size as a criterion. Thus, it argues to apply such a test would leave officers of small organizations wondering whether their group has become

8. The pertinent statute reads:
    (1) A place of public accommodation, subject to the exclusion in subsection (2) of this section, means any place or service offering to the public accommodations, advantages, facilities or privileges whether in the nature of goods, services, lodgings, amusements or otherwise.
    (2) However, a place of public accommodation does not include any institution, bona fide club or place of accommodation which is in its nature distinctly private.
    Or.Rev.Stat. § 30.675 (1979).

9. *Cf. Graham v. Kold Kist Beverage Ice, Inc.,* 43 Or.App. 1037, 607 P.2d 759 (1979) (construing Or.Rev.Stat. § 30.675 (1979)), decided since *Schwenk,* and holding that "a corporation engaged in the wholesale business of selling commercial equipment at wholesale for use in retail

stores * * *" is *not* engaged in the sale of goods "to the public" and is, therefore, not a "public accommodation." *Id.* at 1042, 607 P.2d at 762. The wholesaler had agreed to sell its ice machines to plaintiff Graham and then refused when it discovered that he was black. The decision relies on *Schwenk.* If *Graham* is not reversed by the Oregon Supreme Court, then there is yet another reason for this court to find *Schwenk* an inapposite analogy; under Minn.Stat. § 363.01(18) (1980) one could not argue that a wholesaler was not a "public accommodation," for it undoubtedly would be a "business"—and would be guilty of violating the statute if it so engaged in racial discrimination. *Schwenk* is, therefore, of dubious value in deciding the present case.

too big to avoid the criminal penalties of the statute.

■ The national organization's contention lacks merit. A public organization can avoid criminal penalties by simply not engaging in prohibited, unfair discrimination. Private associations and organizations—those, for example, that are selective in membership—are unaffected by Minn.Stat. § 363.01(18) (1980). Any suggestion that our decision today will affect such groups is unfounded.

We, therefore, reject the national organization's suggestion that it be viewed analogously to private organizations such as the Kiwanis International Organization. Instead, we look at what this national organization is by itself. The record before us reveals a national organization that strives for growth, especially in "individual memberships"; it is unselective in those to whom it sells its memberships; selectiveness occurs only in the privileges and benefits it accords to those holding one kind of membership rather than another.

Counsel for the national organization contended, in oral argument, that a process of "natural selection" operates to make its membership selective. We find that process unexplained, unsupported, and unpersuasive. We find, in fact, that the national organization encourages continuous recruitment and discourages the use of any selection criteria. More than 80% of the national officers' time is devoted to spurring on the sale of memberships. The *Regional Director's Handbook 1977–78* advises: "Don't set membership goals for chapters. Let them set their own (as long as they plan an *increase* in membership)." (Exhibit 44, p. 14) (emphasis in original). The national organization's *Committee Chairman's Workbook*, in its instructions on how a chairman should present a project for his board's approval, proclaims that "Jaycees are in the *People* business—not the project business" (Exhibit 43, p. 2) (emphasis in original) and advises the chairman to emphasize and link "Publicity Value and Recruitment Value. If your project will get the chapter's name in the paper and will possibly result in a few new members for the chapter, be sure that these facts 'headline' your presentation. It's sure to 'perk up their interest' in your project." (Exhibit 43, p. 5). More than half of the organization's individual and group achievement awards are conditioned, in part, upon recruitment achievement. (Exhibit 76). The organization encourages record breaking performance in selling memberships, e. g., most in a year by one person (348), most in a month (134), most in a lifetime (1,586). (Exhibit 70, p. 20). This continuous concern for growth undercuts the national organization's claim to be a private organization.

Most important, though, is the absence of selection criteria. This is evinced by the national organization's *Officer & Directors' Guide 1977–78* which advises that the emphasis in recruitment be on quantity rather than quality: "What is your obligation as Jaycees? Is it to only recruit a chosen few who * * * are deemed to be quality members? * * * How you sign up a member is not nearly as important as what you do with that member once he has been inducted." (Exhibit 52, p. 21). According to Lowell Larson, the Executive Director for the affiliated organization of Minnesota, the national organization does not publish anything with respect to criteria that local chapters should use to select their members; there is, instead, an emphasis on soliciting memberships from "as many people and as diverse as possible." (Hearing Transcript, p. 112). Mr. Larson further testified that, to his knowledge, there has never been a rejection of any application for membership. (Hearing Transcript, p. 135). By virtue of its unselective, vigorous sale of memberships, the national organization is a *public* business.

We pass to the last and seemingly most difficult question: Is this national organization a public business *facility*? The national organization contends that only if it were to "establish a business at a physical location within the State of Minnesota, and invite the patronage of the general public * * * *" would that "place" or "facility" constitute a place of public accommodation un-

der Minn.Stat. § 363.01(18) (1980). Brief for Appellant at 17. That argument substitutes a literal, ordinary definition of "place of public accommodation" for the one enacted by the legislature. The history of the anti-discrimination statutes shows that the scope of the older statute, still in force, Minn.Stat. § 327.09 (1980), concentrated on locations and encompassed both fixed and mobile sites. The newer statute, in controversy here, Minn.Stat. § 363.01(18) (1980), focuses on the *conduct* of a "business facility of any kind." We are not persuaded by analogies to hotels, restaurants, and "hot tamale stand[s]". Brief for Appellant at 17.

Food and lodging do not exhaust the category of a "business * * * facility of any kind * * * *whose* goods, * * * *privileges*, [and] *advantages* are * * * sold or otherwise made available to the public." Minn. Stat. § 363.01(18) (1980) (emphases added). Leadership skills are "goods," business contacts and employment promotions are "privileges" and "advantages," and each site in the State of Minnesota where the sale of those "goods" is solicited, promoted, and consummated is unquestionably a "business facility."

If we were to look for a fixed site of the national organization's "business facility" we would find it in the affiliated state organization's headquarters in Chaska, Minnesota, where the state organization's officers devote much of their time to promoting the solicitation and sale of memberships by the local chapters.

If we were to look for mobile sites of the national organization's "business facilities"

we would find them in the sometimes door-to-door, company-to-company solicitation of members for the organization, and we would find them in the oft-shifted sites at which the affiliated local chapters hold meetings during part of which a sales approach is usually made to prospective members invited to the meeting for that purpose. *See Future*, March-April 1979, at 24 ("Many chapters use refreshments as a means to get [membership] prospects to the meeting, * * * if that is the only way—use it." quoting *New Recruitment Manual* (Exhibit 54)). A variety of enterprises that serve the public do not extend their goods and privileges from the same physical location (e. g. electricians, locksmiths, learning-at-home courses), and often they do not own or lease the sites at which they offer their goods and privileges. *Cf. First National Bank v. Dickinson*, 396 U.S. 122, 137, 90 S.Ct. 337, 345, 24 L.Ed.2d 312 (1969), (holding that an armoured car picking up merchants' cash boxes and checks is a *branch bank, a place of business*, under § 7 of the McFadden Act.)

An instructive analogy can be found in a decision by the New Jersey Appellate Division that held Little League to be a "place of public accommodation." *National Organization for Women v. Little League Baseball, Inc.*, 127 N.J.Super. 522, 318 A.2d 33, *aff'd mem.*, 67 N.J. 320, 338 A.2d 198 (1974). Unlike the new statute in the instant case, the New Jersey statute does not provide a brief definition of "place of public accommodation"; instead, it enumerates 65 varieties of such places.[10] Little League

---

**10.** The pertinent statute reads:

"A place of public accommodation" shall include, but not be limited to: any tavern, roadhouse, hotel, motel, trailer camp, summer camp, day camp, or resort camp, whether for entertainment of transient guests or accommodations of those seeking health, recreation or rest; any producer, manufacturer, wholesaler, distributor, retail shop, store, establishment, or concession dealing with goods or services of any kind; any restaurant, eating house, or place where food is sold for consumption on the premises; any place maintained for the sale of ice cream, ice and fruit preparations or their derivatives, soda water or confections, or where any beverages of any kind are retailed

for consumption on the premises; any garage, any public conveyance operated on land or water, or in the air, any stations and terminals thereof, any bathhouse, boardwalk, or seashore accommodation; any auditorium, meeting place, or hall; any theatre, motion-picture house, music hall, roof garden, skating rink, swimming pool, amusement and recreation park, fair, bowling alley, gymnasium, shooting gallery, billiard and pool parlor, or other place of amusement; any comfort station; any dispensary, clinic or hospital; any public library; any kindergarten, primary and secondary school, trade or business school, high school, academy, college and university, or any educational institution under the supervision of the

was not one of the enumerated varieties. The New Jersey court considered a broad construction of "place" to be appropriate because "the statutory noun 'place' (of public accommodation) is a term of convenience, not of limitation." 127 N.J.Super. at 531, 318 A.2d at 37. The court then observed that the "place," in the case of Little League, is the ball field. Presumably the court was not unaware of the fact that Little League often does not own the real estate on which its ball fields are located, for as the court noted:

> [W]e discern nothing in the statute or its underlying purposes to persuade us that what would otherwise be a place of public accommodation is any less so because its management and sponsorship is by a nonprofit or membership organization rather than a commercial enterprise, or because it does not have exclusive use of possession of the site of its operations.

*Id.* at 531–32, 318 A.2d at 38.

The national organization before this court attempts to distinguish the *Little League* case on two grounds. First, it argues that Little League dominates organized baseball for children, whereas this national organization does not dominate the field of organized community services. That distinction is irrelevant to the question of what constitutes a "place of public accommodation," because no insight into that question can be drawn from the concept of such domination.

The national organization's second basis for distinguishing *Little League* is that Little League, by making extensive use of local community owned facilities, thereby engaged in discrimination on public property and thus involved a unit of government. The New Jersey court did not decide the case on, or even mention that as a basis for its decision. Again, the distinction does not detract from the significant fact that the New Jersey Supreme Court held that a "place of public accommodation" or a "facility" is less a matter of whether the organization operates on a permanent site, and more a matter of whether the organization engages in activities in places to which an unselected public is given an open invitation.

The question, therefore, of what constitutes a "facility," or more precisely, a "public business facility" turns ultimately on whether the organization invites only a screened and selected portion of the public, or whether, instead, it has a standing, open invitation to an unscreened, unselected, and unlimited number of persons from the general public. Little League did little screening except to age and sex, and the New Jersey Supreme Court affirmed a decision that Little League constituted a "place of public accommodation." By contrast, the national organization before this court does even less screening because it admits women to associate membership, and therefore, it has given an open invitation to virtually anyone to become a dues paying individual or associate member.

The meeting place to which that unscreened, unselected, and unlimited number of persons is invited, constitutes as we see it a public business *facility*.

We have discussed the term "facility" with regard to sites, both fixed and mobile. We acknowledge, however, that courts in other jurisdictions have construed the term more liberally, and have done so since the late Nineteenth Century—a time when this state's anti-discrimination statute was new and included mention of "facilities." Thus, in 1898, the Supreme Court of Montana had to decide whether money raised by a tax levied, under a statute, for the purpose of

State Board of Education, or the Commissioner of Education of the State of New Jersey. Nothing herein contained shall be construed to include or to apply to any institution, bona fide club, or place of accommodation, which is in its nature distinctly private; nor shall anything herein contained apply to any educational facility operated or maintained by a bona fide religious or sectarian institution, and the right of a natural parent or one in loco parentis to direct the education and upbringing of a child under his control is hereby affirmed; nor shall anything herein contained be construed to bar any private secondary or post-secondary school from using in good faith criteria other than race, creed, color, national origin or ancestry, in the admission of students.

N.J.Stat.Ann. § 10:5–5(*I*) (West Sup.1980).

furnishing "additional school facilities" could be used to pay salaries of teachers; the question depended upon the scope of the expression "additional school facilities" as employed in the statute. The court rejected a narrow interpretation that would have limited such "facilities" to inanimate objects. *State ex rel. Knight v. Cave,* 20 Mont. 468, 52 P. 200, (1898). As the court observed,

> [t]hat which aids, assists, or makes more easy the acquisition of knowledge is a convenience and an advantage, and is clearly a "facility." Books, maps, globes, and charts are facilities to the imparting of knowledge. * * * But the meaning of the word is not limited to inanimate bodies or things. *Men are often facilities.* Without a crew to man his vessel, the master of a ship would not have the necessary facilities. A school with a complement of pupils in every room, but lacking teachers, would certainly not have facilities to carry on educational work. * * * Parents often remove their families to a place with good school or educational facilities, the chief reason actuating them being the quality of teachers, and not the mere inanimate advantages. * * * Teachers are the means of imparting knowledge to pupils, and are therefore educational facilities.

20 Mont. at 475–76, 52 P. at 203 (emphasis added). *Accord, Nekoosa-Edwards Paper Co. v. Railroad Commission of Wisconsin,* 193 Wis. 538, 547, 213 N.W. 633, 636 (1927) ("facilities" includes human agencies) ("We see no difficulty in holding that the switch engine with its crew * * * constitutes a facility * * *."); *see Cheney v. Tolliver,* 234 Ark. 973, 977, 356 S.W.2d 636, 634 (1962).

■ We need not decide whether "facilities" should be construed to include persons. What we decide here is that an organization engaged in the business of seeking to advance its members and to add to their ranks by assiduously selling memberships in this state is a "public business facility." In more familiar terms, such an organization has more than the "minimum contacts" to qualify as doing business in this state, and its facilities are anywhere it promotes, solicits, and engages in the sale of memberships on an unselective basis. We have discussed this question, for the most part, without reference to the prohibited kind of discrimination involved in this case. The certified question does not ask us to weigh the merits of this organization's business policies. If the national organization now before this court were conducting its business by discriminating on the basis of race, prohibited in Minnesota since 1885, we would have no difficulty holding that its activity was prohibited; the fact that the discrimination in this case is based on sex, prohibited in Minnesota since 1973,[11] in no way alters our decision and its grounds. The answer to the certified question is affirmative.

SHERAN, Chief Justice (dissenting).

Although the result reached in the majority opinion is felicitous, I cannot believe that the members of the Minnesota legislature who voted for the law we have been called upon to construe thought the Junior Chamber of Commerce, a service organization, to be "a place of public accommodation." The obligation of the judiciary is to give that meaning to words accorded by common experience and understanding. To go beyond this is to intrude upon the policy-making function of the legislature. The majority opinion does that in this case to a degree which compels this expression of dissent.

PETERSON, Justice.

I join in the dissent of Chief Justice Sheran.

TODD, Justice.

I join in the dissent of Chief Justice Sheran.

---

11. Act of May 24, 1973, ch. 729, § 3, 1973 Minn.Laws 2158, 2164.