**Human Rights Commission, Waltraud Keiley, Marilyn McMillan, Jane Thibodeau and Mayleen Ventura v. Benevolent and Protective Order of Elks of the United States of America and B.P.O.E., Hartford, Vermont, Lodge No. 1541**

[839 A.2d 576]

No. 01-495

Present: Amestoy, C.J., Dooley, Morse[1] and Skoglund, JJ., and Allen, C.J. (Ret.), Specially Assigned

Opinion Filed November 7, 2003

---

[1] Justice Morse sat for oral argument but did not participate in this decision.

*Robert Appel*, Executive Director, Vermont Human Rights Commission, Montpelier, and *Edwin L. Hobson*, Burlington, for Plaintiffs-Appellants.

*Norman E. Watts*, Woodstock, for Defendant-Appellee Benevolent and Protective Order of the Elks, Hartford, Vermont.

*Robert Reis* and *Matthew Anderson* of *Webber, Reis, Holler & Urso, LLP*, Rutland, and *Elizabeth A. Knight* of *Knight, Hoppe, Fanning & Kurnik, LLC*, Des Plains, Illinois, for Defendant-Appellee Benevolent and Protective Order of the Elks of United States.

¶ 1. **Amestoy, C.J.** This appeal arises out of the Washington Superior Court's summary judgment dismissal of plaintiffs' claim that defendants, Benevolent and Protective Order of Elks of the United States of America ("National Elks") and Benevolent and Protective Order of Elks, Hartford, Vermont, Lodge 1541 ("Hartford Lodge"), discriminated against them on the basis of sex in violation of 9 V.S.A. § 4502(a) when plaintiffs' applications for membership in the Hartford Lodge were denied. On appeal, plaintiffs argue that the trial court erred by: (1) ruling that the Fair Housing and Public Accommodations Act ("FHPA"), 9 V.S.A. §§ 4500-4507, does not bar membership discrimination by fraternal lodges; and (2) granting summary judgment for defendants because genuine issues of material fact still remained. We agree, and therefore reverse and remand for further proceedings consistent with this opinion.

¶ 2. This case is not about whether a genuinely private club—fraternal or otherwise — can choose to discriminate on the basis of sex in membership selection. That a private club can do so under our public accommodations statute — whatever one thinks of the merits of such a choice — is not open to doubt. See *United States Jaycees v. McClure*, 305 N.W.2d 764, 771 (Minn. 1981) (private associations and organizations are unaffected by state's public accommodations law, and a court's determination that one organization is not private under statute will have no effect on groups that are in fact private and selective in membership). The issue before us is whether the Hartford Lodge *is* a private club, or is so open and nonselective in offering its facilities and privileges that it can be

considered a "place of public accommodation" within the meaning of the FHPA.

¶ 3. We conclude that membership in a fraternal organization is covered by the FHPA if such membership is essentially open to the public, and we remand the case to the trial court so that the trier of fact may make the factual findings necessary for a determination of that issue. Our decision today is in conformity with the decisions of other jurisdictions, which have held that similar public accommodations statutes extend to the membership of a fraternal order in certain circumstances. See, e.g., *Fraternal Order of Eagles, Inc., Tucson Aerie #180 v. City of Tucson*, 816 P.2d 255, 256 (Ariz. Ct. App. 1991) (holding that fraternal organization is subject to local public accommodations ordinance as a "place of public accommodation"); *Schellenberg v. Rochester, Michigan Lodge No. 2225, of Benevolent & Protective Order of Elks*, 577 N.W.2d 163, 169 (Mich. Ct. App. 1998) (discussing prior appeal where appellate court already found that Elks was a "place of public accommodation"); *Franklin Lodge of Elks v. Marcoux*, 825 A.2d 480, 485 (N.H. 2003) (holding that public accommodations statute extends to Elks membership); *Lahmann v. Grand Aerie of Fraternal Order of Eagles*, 43 P.3d 1130, 1131 (Or. Ct. App.), *review denied*, 54 P.3d 1041 (Or. 2002) (remanding for factual determination of whether fraternal order was "place of public accommodation"); *Fraternal Order of Eagles, Tenino Aerie No. 564 v. Grand Aerie of Fraternal Order of Eagles*, 59 P.3d 655, 668 (Wash. 2002) ("[T]he [Washington Law Against Discrimination] reaches the membership policies of organizations.").

¶ 4. Hartford Lodge is a subordinate lodge of National Elks, the largest benevolent fraternal order in America with approximately 1,200,000 members and over 2000 local lodges. At the time of plaintiffs' applications, Hartford Lodge had 1042 members. From its inception in 1868 until 1995, National Elks required all candidates for membership to be male. In 1995, the statutes of the National Elks were amended to delete this requirement. The charter of the Hartford Lodge was automatically amended to conform to the change by operation of the National Elks statutes, despite the fact that Hartford Lodge voted against the amendment. The amendment was communicated to the Hartford Lodge through mailings, a speech, a newsletter and a magazine.[2]

¶ 5. To qualify for membership in the Elks, an individual must be a United States citizen, at least twenty-one years of age, of good character, and must believe in God. Hartford Lodge also alleges that it adheres to

---

[2] At the time of oral argument, Hartford Lodge had admitted women as members.

an application screening process that consists of: a private invitation to visit the Lodge; several visits by the prospect to meet members; the prospect requesting and receiving a membership application; the prospect submitting an application with personal history information; the prospect pledging to pursue the organization's charitable objectives and adhere to its statutes, bylaws, obligation and other rules, rituals and procedures; an investigation of the prospect's background by a Hartford committee; approval of the investigation committee based on National's written membership criteria noted above; evaluation of the application and an investigation committee report by the full membership; subjective evaluation by the full membership of whether the prospect is "compatible"; and approval of full membership and induction with formal pledge. Plaintiffs alleged on summary judgment that Hartford Lodge had over a 99% acceptance rate for white men, and that it accepted 269 new members from 1990-99, rejecting only ten applicants. Seven of these applicants were women, including plaintiffs, and one was an African American man.

¶ 6. Hartford Elks owns and operates a large lodge facility in White River Junction. It opens these facilities to the public for weekly bingo games and rents the premises to members of the general public for private functions, such as wedding receptions which it will also cater for a fee. During the fiscal year ending in March 1996, Hartford Lodge reported $1,113,636 in gross revenue from bingo and rip-open tickets. Plaintiffs allege that National Elks received over $12,000,000 from membership dues in the year plaintiffs applied for membership, and that this constituted 80% of its earned income for the year, although these allegations are in dispute.

¶ 7. In 1996, plaintiffs Waltraud Keiley, Marilyn McMillan, Jane Thibodeau, and Mayleen Ventura applied for membership as the first female applicants to Hartford Lodge. The four women were members of the Hartford Elks Emblem Club, which holds meetings at the Hartford Lodge, at the time of their membership applications. The women were interviewed by an investigating committee and were recommended for acceptance as members. Hartford Lodge then voted on the membership applications, and rejected the female applicants but accepted the sole male applicant at that time. At a second meeting in January 1997, the women applicants again failed to receive the necessary votes and were not admitted to Hartford Lodge as members.

¶ 8. In August 1998, plaintiff Vermont Human Rights Commission and the individual plaintiffs filed this case against defendants in superior court. National Elks filed a motion for summary judgment in December

1999, and the court denied the motion on April 13, 2000 in a decision and order written by Judge Bryan. In his decision, Judge Bryan noted Vermont's "public policy commitment to eradicating sex discrimination by public establishments in this state" as demonstrated through its legislative enactment of anti-discrimination and human rights laws. The court determined that "Hartford Elks Lodge is a place of 'public accommodation' because it is in the business of selling memberships to a club" and rejected National Elks' argument that it had no authority or involvement over the membership decisions of a local lodge.

¶ 9. Hartford Lodge filed a motion to reconsider the April 13th decision in which Judge Bryan determined that Hartford Elks was a place of public accommodation. Hartford Lodge argued that whether the Hartford Elks is a place of public accommodation is a disputed fact for the jury to determine. Judge Bryan declined to alter the April 13th decision, observing that "if the question of public accommodation is still alive, it is certainly not well. This question likely will be disposed of quickly at trial, and if not by the court as a matter of law, then by the jury under instructions that will leave little doubt as to the result." He added that "the Hartford Elks remains at liberty to convince Judge Katz, if it can, that the question of public accommodation is for the jury. After hearing the evidence, he remains free to submit the question [to the jury], should he so choose."

¶ 10. In September 2000, plaintiff Human Rights Commission filed a motion for summary judgment. National Elks also filed a second motion for summary judgment in October 2000, followed by Hartford Lodge's motion for summary judgment, which was filed in November 2000. On October 17, 2001, the superior court ruled on the motions and dismissed the case in favor of defendants. In its order, written by Judge Katz, the court concluded that "the [FHPA] does not govern the membership of Hartford Elks, merely its operation of its admittedly public facilities. . . . i.e., bingo games and rental of the hall to large groups." The court reached its conclusion based on its determination that the operative section of the statute, 9 V.S.A. § 4502(a), was governed, for the purposes of this case, by the definition of "place of public accommodation" contained in 9 V.S.A. § 4501(1), and that this definition did not bar discrimination by the Hartford Elks "providing they remain strictly selective in their membership requirements and procedures."

¶ 11. In reviewing a grant of summary judgment, we apply the same standard as the superior court. *Wentworth v. Fletcher Allen Health Care*, 171 Vt. 614, 616, 765 A.2d 456, 459 (2000) (mem.). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." V.R.C.P. 56(c)(3). It is not the function of the trial court to find facts on a motion for summary judgment. *Fritzeen v. Trudell Consulting Eng'rs, Inc.*, 170 Vt. 632, 633, 751 A.2d 293, 296 (2000) (mem.). Thus, as long as a genuine issue of material fact remains, summary judgment may not serve as a substitute for a determination on the merits. *Id.*

## I.

¶ 12. Plaintiffs first argue that the trial court erred by ruling that, as a matter of law, the Fair Housing and Public Accommodations Act ("FHPA"), 9 V.S.A. §§ 4500-4507, does not bar membership discrimination by fraternal lodges. Section 4502(a) of the Fair Housing and Public Accommodations Act, a remedial statute, prohibits an owner or operator of a place of public accommodation from refusing or denying a person the advantages or privileges of the place of public accommodation on the basis of the person's race, creed, color, national origin, marital status, sex or sexual orientation. 9 V.S.A. § 4502(a).[3] Section 4501(1) defines "place of public accommodation" as "any school, restaurant, store, establishment or other facility at which services, facilities, goods, privileges, advantages, benefits or accommodations are offered to the general public."

¶ 13. The interpretation of a statute is a question of law, and therefore this Court's review is "nondeferential and plenary." *In re S. Burlington-Shelburne Hwy. Proj.*, 174 Vt. 604, 605, 817 A.2d 49, 51 (2002) (mem.). Our paramount goal, when interpreting a statute, is to effectuate the intent of the Legislature. *Tarrant v. Dep't of Taxes*, 169 Vt. 189, 197, 733 A.2d 733, 739 (1999). In order to effectuate this intent, we look to the statute's language and any legislative history, as well as the legislative policy the statute was designed to implement. *Perry v. Med. Practice Bd.*, 169 Vt. 399, 406, 737 A.2d 900, 905 (1999). We are guided by the "whole of the statute and every part of it, its subject matter, the effect and consequences, and the reason and spirit of the law." *In re P.S.*, 167 Vt. 63, 70, 702 A.2d 98, 102 (1997). Where there are similar statutes in other jurisdictions, we are also guided by the interpretations of those statutes.

---

[3] Section 4502(a) of Title 9 reads:

> An owner or operator of a place of public accommodation or an agent or employee of such owner or operator shall not, because of the race, creed, color, national origin, marital status, sex or sexual orientation of any person, refuse, withhold from or deny to that person any of the accommodations, advantages, facilities and privileges of the place of public accommodation.

*State v. Weller*, 152 Vt. 8, 13, 563 A.2d 1318, 1321 (1989). As a remedial statute, the FHPA must be liberally construed in order to "suppress the evil and advance the remedy" intended by the Legislature. 3 N. Singer, Statutes and Statutory Construction § 60:1, at 183 (6th ed. 2001); see also *Human Rights Comm'n v. LaBrie, Inc.*, 164 Vt. 237, 245, 668 A.2d 659, 665 (1995); *Town of Killington v. State*, 172 Vt. 182, 191, 776 A.2d 395, 402 (2001).

¶ 14. One such evil that public accommodations statutes, such as the FHPA, seek to suppress is the "deprivation of personal dignity that surely accompanies denials of equal access to public establishments." *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 250 (1964). By preventing this "stigmatizing injury, and the denial of equal opportunities that accompanies it," the Legislature, through the FHPA, rejects archaic stereotypes and protects the citizens of Vermont from "a number of serious social and personal harms." *Roberts v. United States Jaycees*, 468 U.S. 609, 625 (1984) (discussing purpose of similar public accommodations statute in Minnesota).

¶ 15. When the FHPA was first enacted in 1957, predating comparable versions of the federal Civil Rights Act of 1964, sex was not a protected classification. Over the last forty-five years, however, several amendments have broadened its scope with regard to the groups protected from discrimination under the statute and the establishments or facilities covered by definition. In Vermont, it has been illegal to deny a person the privileges or advantages of a place of public accommodation on the basis of sex since 1988. See 1987, No. 74, § 1 (codified at 9 V.S.A. § 4502(a)) (adding sex as a protected classification under the statute).[4]

¶ 16. Many states, as well as the federal government, have created an exemption from the definition of "place of public accommodation" for

---

[4] In his summary judgment decision, Judge Katz observed that "we would expect an amendment regulating 'gender discrimination' within Vermont's fraternal organizations to have engendered considerable discussion. There was none on the subject." We note first that both the trial court's and National Elks' citations refer only to legislative committee hearings from the 1992 amendments, at which time the Legislature added the definition for "public accommodation" contained in 9 V.S.A. § 4501(8). We have determined, however, that this is not the relevant portion of the statute. Furthermore, we have been unable to ascertain whether there was legislative debate in the 1987 session, Act No. 74 (H. 180), which added "sex" as a protected classification. While legislative discussion on the matter could be helpful in determining legislative intent, the issue of whether any debate existed is not dispositive or necessarily instructive. See, e.g., *Vt. Dev. Credit Corp. v. Kitchel*, 149 Vt. 421, 428, 544 A.2d 1165, 1169 (1988) (testimony and statements of legislative witnesses and individual legislators were "inconclusive at best, and, standing alone, 'have never been regarded as sufficiently compelling to justify deviation from the plain language of a statute' ") (quoting *United States v. Oregon*, 366 U.S. 643, 648 (1961)).

bona fide clubs which are distinctly private in nature. See, e.g., Ariz. Rev. Stat. Ann. § 41-1441(2) (West 1992); Ark. Code Ann. § 16-123-102(7)(B) (Michie Supp. 2003); Idaho Code § 18-7302(e) (Michie 1997); Kan. Stat. Ann. § 44-1002(h) (2000); Ky. Rev. Stat. Ann. § 344.130(1) (Michie 2001); La. Rev. Stat. Ann. § 49:146(A)(2) (West 2003); Md. Code Ann., Art. 49B, § 5(f) (2003); Mich. Comp. Laws Ann. § 37.2303 (West 2001); Minn. Stat. Ann. § 363.02(2) (West 1991); Mont. Code Ann. § 49-2-101(20)(b) (2003); Neb. Rev. Stat. § 20-138 (1997); N.H. Rev. Stat. Ann. § 354-A:2 (XIV) (1995); N.M. Stat. Ann. § 28-1-2(H) (Michie 2000); N.D. Cent. Code § 14-02.4-02(12) (1997); Okla. Stat. Ann. 25 § 1401(1)(i) (West 1987); Or. Rev. Stat. § 659A.400(2) (2001); R.I. Gen. Laws § 11-24-3 (2002); S.C. Code Ann. § 45-9-20 (2002); S.D. Codified Laws § 20-13-1(12) (2002); Tenn. Code Ann. § 4-21-102 (2003); Utah Code Ann. § 13-7-2(1) (2001); Wash. Rev. Code Ann. § 49.60.040(10) (West 2002); Wis. Stat. Ann. § 106.52(1)(e)(2) (West 2002). The public accommodations statute in New York goes further and specifically includes benevolent orders, such as the Elks, within its "distinctly private" exemption. N.Y. Exec. Law § 292(9) (McKinney 2001) ("For the purposes of this section, a corporation incorporated under the benevolent orders law or described in the benevolent orders law but formed under any other law of this state . . . shall be deemed to be in its nature distinctly private.").

¶ 17. Our Legislature, however, did not create such an exemption for fraternal organizations in the FHPA. The Legislature has created exemptions for fraternal organizations when it clearly intends to exempt fraternal organizations from the ambit of a statute. For example, the Legislature has included several exceptions for fraternal organizations and institutions in other statutes. See 31 V.S.A. § 506 (municipal regulation of dance halls, bowling alleys, pool halls and coasting); 9 V.S.A. § 4452(3) (residential rental agreements); 18 V.S.A. § 1743(1) (smoking in public places). The Elks contend that such an exemption is not necessary where, as the group argued here, a fraternal organization is clearly not included under the definition of "place of public accommodation" in the first place. In 1993, however, the Legislature specifically exempted from "places of public access," 18 V.S.A. § 1741(2), "buildings owned and operated by . . . fraternal . . . organizations when used by the membership of the organization, their guests or families" from the restrictions on the possession of lighted tobacco products. *Id.* § 1743(1). Finally, in 9 V.S.A. § 4502(d), the Legislature created an exemption to the public accommodations section of the FHPA for owners of establishments which provide lodging to transient guests with five or fewer rooms for rent, and it did not include fraternal organizations within this exemption section. We will

not presume an exemption to exist where the Legislature has not so intended or indicated through the plain language of the statute. Cf. *Vt. Dev. Credit Corp. v. Kitchel*, 149 Vt. 421, 425, 544 A.2d 1165, 1167 (1988) (if Legislature intended to exempt an organization from a statute it could have added it to list of exempted organizations, and where it did not, we will not presume an exemption to exist).

¶ 18. Notwithstanding the trial court's doubt that the Legislature considered the potential impact of the FHPA on fraternal organizations, the trial court's summary judgment opinion properly framed the salient question before it: "The issue in this case is whether the Hartford Elks, and more specifically membership in the Hartford Elks, is a 'place of public accommodation' such that it is subject to the provisions of the statute." For the reasons more fully explained below, we conclude that answering that question on summary judgment was premature, given the genuine issues of material fact still in dispute.

## II.

¶ 19. The assessment of whether a club constitutes a place of public accommodation rather than a private selection entity has been the subject of substantial case law. See *Franklin Lodge*, 825 A.2d at 485 (listing cases). Courts have commonly applied and weighed several factors to determine whether a club is private or public including: (a) whether the group's membership is genuinely selective; (b) the amount of control the existing members have over the club's operations; (c) the history of the organization; (d) the use of club facilities by nonmembers; (e) whether the organization advertises or directs its publicity to anyone other than members; (f) the purpose of the organization; and (g) any profit motive. See, e.g., *id.*; *McClure*, 305 N.W.2d at 770 (stating that two criteria tend to be used in cases deciding whether a group is private or public for the purposes of a public accommodations statute: (1) the selectiveness of the group in the admission of members and (2) the existence of limits on the size of the membership).

¶ 20. The principal factor in determining whether a club fits within the definition of "place of public accommodation" is a club's selectivity. See *Fraternal Order of Eagles, Tenino Aerie No. 564*, 59 P.3d at 669 ("Inquiry entails examining the selectivity of the organization in membership practices and scrutinizing whether the invitation to gather is open to the public."); *United States v. Trustees of Fraternal Order of Eagles, Milwaukee Aerie No. 137*, 472 F. Supp. 1174, 1175 (E.D. Wis. 1979) ("[T]he most important factor in determining whether a club is in fact private is the process which the club *actually* uses in selecting its

members.") (emphasis added). It is not enough for an organization to appear selective on paper while in fact offering memberships to the general public; rather an organization must be *genuinely* selective. See *United States v. Lansdowne Swim Club*, 894 F.2d 83, 86 (3d Cir. 1990). Procedures and criteria for membership are "insufficient to establish selectivity where they do not function as true limits on admission." *Franklin Lodge*, 825 A.2d at 486.

¶ 21. This selectivity factor is so important that it alone may be determinative of the outcome if an organization lacks genuine selectivity. *Id.* "[A] formal procedure requiring nothing more than membership approval is insufficient to show genuine selectivity." *Lansdowne Swim Club*, 894 F.2d at 86 (determining that swim club criteria for membership admission of being interviewed, completing an application, submitting two letters of recommendation and tendering payment of fees were not "genuinely selective"); see also *Trustees of Fraternal Order of Eagles, Milwaukee Aerie No. 137*, 472 F. Supp. at 1176 (finding that Eagles Club formal membership requirements were not selective in fact when, among other factors, the number of applications accepted were compared with the number of rejected applications).

¶ 22. Hartford Lodge substantially relies upon *Kiwanis Int'l v. Ridgewood Kiwanis Club*, 806 F.2d 468, 476 (3d Cir. 1986), in which the United States Court of Appeals held that a local club, Kiwanis Ridgewood, was not a "place of public accommodation" within the meaning of New Jersey's statute that prohibits unlawful discrimination in places of public accommodation. In stark contrast to Hartford Lodge, which has some 800-1000 members, the Kiwanis Ridgewood club had only twenty-eight members. *Id.* at 475. In its selectivity analysis, the court noted that ten of the twenty-eight members had been members for over twenty years, and that, in the decade preceding the case, Kiwanis Ridgewood admitted no more than twenty new members. *Id.* Hartford Lodge admitted approximately 270 new members from 1990-1999, and there is no indication that the Elks have a limit on the number of new members allowed.

¶ 23. Here, plaintiffs presented evidence on summary judgment that National Elks issues a Membership Control Manual to all Lodges in which it emphasizes the importance of maintaining "good business principles and management practices" in "a Lodge's Membership Procurement Program." The manual encourages each lodge to set definite goals for "Membership Procurement" of "at least 10 percent of the year's beginning membership: *i.e.*, if membership was 700 on April 1, the Lodge's goal should be to initiate 70 new members." National Elks encourages lodges to "promote friendly rivalries among committees and

the membership, both for submitting the names of prospects and for actually signing them up" and to "reward a winning committee or team with a free dinner or other minor recognition." The National Grand Lodge gives awards and offers incentives for members who sponsor or recruit a certain number of new members. In a sample letter for new members, it writes that membership would be beneficial to "every one of our neighbors who is at least 21 and believes in God and in helping others." The Minnesota Supreme Court has declared that this kind of "continuous concern for growth undercuts [a] national organization's claim to be a private organization." *McClure*, 305 N.W.2d at 771 (holding that the United States Jaycees was a "place of public accommodation" covered by statute).

¶ 24. Because the nature of a court's inquiry into whether an organization offers memberships to the general public is fact specific, determinations must be made on a case-by-case basis. The material factual findings required for a determination of genuine selectivity must be made by the trier of fact. See *Lahmann*, 43 P.3d at 1131 (holding that "the question whether the Fraternal Order of the Eagles is a 'place of public accommodation' presents a disputed issue of material fact"); *New York State Club Ass'n v. City of New York*, 505 N.E.2d 915, 919 (N.Y. 1987) ("whether a 'distinctly private' club is a place of public accommodation is a question of fact"), *aff'd*, 487 U.S. 1, 18 (1988). As defendant Hartford Lodge conceded at oral argument before this Court, the defendants' selectivity was "a very hotly disputed issue."

¶ 25. As noted, plaintiffs have alleged that, from 1990-99, only ten applications have been rejected by the Hartford Lodge out of over 270 total applications. Seven of the rejected applicants were women, one was an African American man, and one had a criminal record. Based on this allegation, plaintiffs alleged that Hartford Lodge has a 99.3% acceptance rate for all white men. In its response to plaintiffs' statement of undisputed facts Hartford Lodge did not dispute plaintiffs' raw numbers, but asserted that they yielded a somewhat lower acceptance rate of 97%. More important, Hartford Lodge also alleged that the numbers were misleading because, in fact, the first step in its application process is to screen potential members "for compatibility with existing members." It further alleged that many potential applicants fail to pass this step. Thus, Hartford Lodge argued, in effect, that it was far more selective than the final acceptance figures suggested.

¶ 26. These conflicting claims concerning the actual selectivity level of Hartford Lodge are highly material, and remain in sharp dispute. Furthermore, there is no indication that the trial court considered or

reviewed these material allegations in determining that the Elks is "more private than public." The formal membership procedures that the Elks claim to use are not alone sufficient for a finding of genuine selectivity. See *Franklin Lodge*, 825 A.2d at 486 (determining that use of particular membership criteria and formal screening procedures by Elks are inadequate to establish selectivity where "virtually all men who apply and satisfy minimum standards are admitted"). Because genuine issues of material fact remained regarding defendants' selectivity in extending memberships, it was not appropriate for the trial court to find that the Hartford Lodge was not subject to the Vermont Public Accommodations statute. See *Fritzeen*, 170 Vt. at 633, 751 A.2d at 296 (trial court should not find facts on a motion for summary judgment, nor should summary judgment serve as a replacement for a determination on the merits when a genuine issue of material fact remains); *Fraternal Order of Eagles, Tenino Aerie No. 564*, 59 P.3d at 670 n.126 ("The 'distinctly private' factors serve as material facts because the outcome of the case relies on proving the factors favor one conclusion over the other.").

## III.

¶ 27. National Elks asserts that the summary judgment in its favor should be affirmed for reasons independent of the trial court's conclusion that FHPA does not regulate Hartford's membership. Those additional reasons are: (1) National Elks is not a "place" and thus cannot be a "place of public accommodation" under the FHPA; (2) National Elks is not an "owner or operator of a place of public accommodation" and thus the FHPA does not apply to it; and (3) National Elks cannot be held liable for the alleged discriminatory action of the local lodge. National Elks concedes that the trial court did not reach these additional issues, but invites us to affirm summary judgment as to National Elks on any or each of those grounds. We decline to do so.

¶ 28. First, we are unpersuaded by National Elks' argument that because it does not own a "place" within Vermont, it is insulated from the reach of the public accommodations statute. See *Roberts*, 468 U.S. at 616 (application of Minnesota Human Rights Act to nonprofit national membership appellee United States held valid where Minnesota Supreme Court determined appellee was "a place of public accommodation" within the meaning of the Act).[5]

---

[5] Minnesota defines "place of public accommodation" as "a business, accommodation, refreshment, entertainment, recreation, or transportation facility of any kind, whether licensed or not, whose goods, services, facilities, privileges, advantages or accommodations are extended, offered, sold, or otherwise made available to the public." Minn. Stat. Ann.

¶ 29. Second, decision on the issue of National Elks' liability, if any, for the alleged discriminatory acts of Hartford Lodge is premature. Material issues of fact remain as to whether the Lodge is a public or private entity for purposes of the FHPA. Further, plaintiffs have alleged that National Elks has substantial and direct supervisory responsibility over Hartford Lodge, a representation vigorously disputed by National Elks. National Elks' related legal arguments that agency law and the common law integrated enterprise doctrine disfavor the imputation of liability for discrimination must similarly await the development of a factual record more complete than the one before us.

## IV.

¶ 30. Because we conclude that lodge membership is not necessarily excluded from the definition of "place of public accommodation" under the FHPA, we also address defendant National Elks' argument that this reading of the statute renders it unconstitutionally overbroad and vague. The United States Supreme Court has declared that the "overbreadth doctrine" must be used "sparingly" and "as a last resort." *Broadrick v. Oklahoma,* 413 U.S. 601, 613 (1973). In *Roberts,* the Court upheld the Minnesota Supreme Court's interpretation of the state's public accommodations statute because the court adopted "commonly used and sufficiently precise standards" and applied constructions that would exclude private groups from the statute's reach. 468 U.S. at 631. The Court determined that the "sufficiently precise standards" included "a number of specific and objective criteria — regarding the organization's size, selectivity, commercial nature, and use of public facilities — typically employed in determining the applicability of state and federal antidiscrimination statutes to the membership policies of assertedly private clubs." *Id.* at 629. Thus, the statute, explained the United States Supreme Court, "does not create an unacceptable risk of application to a substantial amount of protected conduct." *Id.* at 631. The Minnesota public accommodations statute contains language similar to Vermont's FHPA, and we have interpreted it on similar grounds using the same familiar standards of application. Thus, we do not agree with defendants' contention that our reading of the statute and use of the applicable tests renders the statute overbroad.

---

§ 363.01(33) (1991). Compare with 9 V.S.A. § 4501(1) which defines "place of public accommodation" as "any school, restaurant, store, establishment or other facility at which services, facilities, goods, privileges, advantages, benefits or accommodations are offered to the general public."

¶ 31. When a statute forbids the doing of an act in terms so vague that persons of common intelligence must guess at its meaning and differ as to its application, it is void for vagueness. *In re S.M.*, 2003 VT 41, ¶ 14, 175 Vt. 524, 824 A.2d 593 (mem.). As with the overbreadth analysis above, the test we articulated for determining the reach of the FHPA to membership organizations is similar to the standards that were formulated by the Minnesota Supreme Court in *McClure* and upheld by the United States Supreme Court in *Roberts*. This confined application ensures that the statute's scope is "readily ascertainable" and removes any void-for-vagueness concerns. See *Roberts*, 468 U.S. at 629-30.

¶ 32. National Elks and Hartford Lodge assert that the FHPA is unconstitutional if applied to membership votes of local fraternal lodges, arguing freedom of intimate association on personal liberty grounds and freedom of expressive association as a First Amendment claim. It is unnecessary to address this constitutional claim given the posture of the case before us, and we will not do so. *In re Wildlife Wonderland, Inc.*, 133 Vt. 507, 520, 346 A.2d 645, 653 (1975) (declaring that we will not consider constitutional claims unless disposition of the case requires it).

¶ 33. We note that in order to preserve the individual liberty secured by the Bill of Rights, highly personal relationships, such as familial relationships, must be protected from unjustified interference by the state. *Roberts*, 468 U.S. at 618-19. These relationships are often characterized by their "relative smallness, a high degree of selectivity in decisions to begin and maintain the affiliation, and seclusion from others in critical aspects of the relationship." *Id.* at 620. Thus, personal associations that lack these qualities will not necessarily be afforded such protection. See *id.* at 621 (finding "the Jaycees chapters lack the distinctive characteristics that might afford constitutional protection to the decision of its members to exclude women" because the two local chapters were "neither small nor selective" where each chapter had around 400 members and new members were "routinely recruited and admitted with no inquiry into their backgrounds" and a local officer "could recall no instance in which an applicant had been denied membership on any basis other than age or sex"). The United States Supreme Court has explained that simply because some amount of intimate association may occur in a club, as may also occur in many restaurants and other places of public accommodation, that alone "does not afford the entity as a whole any constitutional immunity to practice discrimination when the government has barred it from doing so." *New York State Club Ass'n*, 487 U.S. at 12. Like the test for "genuine selectivity" to decide whether an organization is included under the definition of "place of public accommodation,"

certain factual findings must be made by the trier of fact before we can fully consider Hartford Lodge's intimate association claim under the test discussed by the United States Supreme Court in *Roberts*. See *Lahmann*, 43 P.3d at 1138 (declining to reach the issue of whether applying the Oregon Public Accommodation Act to the Fraternal Order of Eagles violates their right of association until after factual findings have been made).

¶ 34. Similarly, a freedom-of-expressive-association First Amendment claim requires courts to "examine whether or not the application of the state law would impose any 'serious burden' on the organization's rights of expressive association. . . . [T]he associational interest in freedom of expression [is] set on one side of the scale, and the State's interest on the other." *Boy Scouts of America v. Dale*, 530 U.S. 640, 658-59 (2000). The argument that the FHPA is unconstitutional if applied to the membership votes of local fraternal lodges requires a much greater record than is before us. See *New York State Club Ass'n*, 487 U.S. at 10 (without record of actual fact that a substantial number of instances exist in which antidiscrimination law cannot be applied constitutionally, it cannot be concluded that the law threatens to undermine the associational or expressive purposes of any club, let alone a substantial number of them). We cannot conclude that the FHPA is unconstitutional on the basis of what is before us, and will not assume the overbreadth ascribed to it by appellees. See *id.*; *Broadrick*, 413 U.S. at 615-16 ("whatever overbreadth may exist should be cured through case-by-case analysis of the fact situations to which its sanctions, assertedly, may not be applied").

*Reversed and remanded for further proceedings consistent with this opinion.*