NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2022 VT 62

No. 22-AP-148

| | |
|---|---|
| Latonia Congress & Human Rights Commission | Supreme Court |
| | |
| v. | On Appeal from<br>Superior Court, Washington Unit,<br>Civil Division |
| | |
| State of Vermont et al. | October Term, 2022 |

Robert A. Mello, J.

Justin G. Sherman of Langrock Sperry & Wool, LLP, Burlington, for Plaintiff-Appellant Human Rights Commission.

Pamela L.P. Eaton of Paul Frank + Collins P.C, Burlington, for Defendant-Appellee Centurion of Vermont, LLC.

PRESENT: Reiber, C.J., Eaton, Carroll and Cohen, JJ., and Johnson, J. (Ret.), Specially Assigned

¶ 1. **COHEN, J.** Plaintiff the Vermont Human Rights Commission appeals the trial court's decision granting summary judgment to defendant Centurion of Vermont LLC on the Commission's claims of discrimination under the Vermont Public Accommodations Act (VPAA), 9 V.S.A. §§ 4500-4507. The Commission brought these claims on behalf of plaintiff Latonia Congress. We affirm.

¶ 2. The record reveals the following background and undisputed facts. At all relevant times, Ms. Congress was incarcerated at a prison owned and operated by the State of Vermont through the Department of Corrections (DOC). The DOC contracts with Centurion, a private corporation, to provide all medical services for inmates at the prison. Centurion is not contracted to provide any other services at the prison.

¶ 3.　Ms. Congress was incarcerated before Centurion began providing medical services at the prison.　Under the previous provider, Ms. Congress was seen by an audiologist, who determined that she had substantial bilateral hearing loss, and she was given hearing aids for both ears.　In April 2016, after Centurion took over medical care, Ms. Congress sought new batteries for her hearing aids, which Centurion provided.　In December 2016, Ms. Congress reported that the hearing aids were not working, and Centurion planned to send them "to Audiology for check of functioning."　Later in December 2016, a doctor examined Ms. Congress's ears and did not find any indication of an obstruction or other problem that might be affecting her hearing.　He noted that she communicated well when he spoke to her in a clear, normal voice.　In January 2017, Ms. Congress delivered her hearing aids to the medical unit to be sent out for testing.　They were returned to her in October 2017 without having been tested.　The record establishes that no one knows what happened to the hearing aids during that time; they were apparently misplaced.

¶ 4.　Through 2017 and early 2018, Ms. Congress attempted numerous times to obtain functioning hearing aids.　She was seen by various doctors under Centurion's supervision who came to different conclusions at different times regarding the extent of her hearing loss and how it affected her ability to function in the facility.　Because Ms. Congress was deemed "functional" for some period of time despite her reported difficulty in hearing conversations, she was not eligible for hearing aids under Centurion's policies.　Eventually, in March 2018, an audiologist concluded that Ms. Congress had moderate to severe bilateral hearing loss, which was worse in one ear, and recommended hearing aids.　She was provided with one hearing aid in April 2018, which improved her hearing in that ear.　Ms. Congress was released from prison in October 2019 and Centurion has not been involved in her medical care since then.

¶ 5.　In March 2020, the Commission filed a complaint against Centurion, the DOC, and other state defendants, alleging, as relevant here, that they discriminated against Ms. Congress in violation of the VPAA by failing to provide her with functioning hearing aids and thereby denying her equal access to certain benefits and services offered at the prison.　It alleged two types of

2

violations: one arising under 9 V.S.A. § 4502(c)(5) and one under § 4502(c)(6). Ms. Congress later filed a separate complaint against Centurion, the DOC, and others, asserting numerous claims based on alleged deficiencies in audiology care. The two cases were consolidated. Before summary judgment, Ms. Congress settled and stipulated to dismiss all claims against all parties except Centurion and a doctor employed by Centurion who had provided her with medical care. Centurion and the doctor filed a joint motion for summary judgment as to all claims against them. Before the court ruled on their motion, Ms. Congress settled with the doctor and he was dismissed from the case. The court's summary-judgment decision thus only addressed claims against Centurion.[1] It granted judgment to Centurion on all of Ms. Congress's claims except medical malpractice, but Ms. Congress later stipulated to dismiss that claim, her last remaining cause of action. She is not involved in this appeal.

¶ 6.     The trial court also granted summary judgment to Centurion on the Commission's VPAA claims. The court explained that generally the VPAA requires a public accommodation to make reasonable modifications to its policies, id. § 4502(c)(5), and to provide reasonable accommodations, so that an individual with a limitation caused by a disability may participate in a service or other benefit that would otherwise be inaccessible because of that limitation, id. § 4502(c)(6). It concluded that Centurion's actions did not violate the VPAA for two main reasons. First, the VPAA contains an exception: "A public accommodation shall not be required to provide individuals with disabilities personal devices, such as wheelchairs, eyeglasses, hearing aids, or readers for personal use or study, or personal services to assist with feeding, toileting, or dressing." Id. § 4502(c)(7) (emphasis added). Thus, the court concluded that under the VPAA, to the extent that Centurion could properly be considered a "public accommodation," it had no legal obligation

---

[1] It is unclear from the record how the Commission's claims against the state defendants were resolved, but in its summary-judgment decision the court stated that "the [Commission] has asserted its claims against Centurion exclusively." Neither party addresses this issue on appeal, focusing instead solely on the claims against Centurion, and so we discuss only those claims.

to provide Ms. Congress with hearing aids, which is precisely what the Commission asserts should have been provided to her.

¶ 7. Second, the court concluded that Centurion's lack of control over the nonmedical services offered at the prison was fatal to the Commission's claims. The court noted that the only service provided by Centurion was medical care, and the Commission did not allege that Centurion ever discriminated against Ms. Congress in the provision of medical care. Instead, the Commission claimed that Centurion's failure to provide timely and adequate medical care prevented Ms. Congress from accessing services and benefits offered exclusively by the DOC, such as academic classes and physical recreation. The trial court reasoned that because the Commission did not allege that Centurion had control or authority over these nonmedical services such that Centurion was responsible for noticing Ms. Congress's lack of access to them and modifying a policy or providing an accommodation to enable access to them, the Commission could not show that Centurion violated the VPAA.

¶ 8. On appeal, the Commission argues that the trial court erred in granting summary judgment to Centurion because the court overlooked material questions of fact. Specifically, the Commission contends that there was an issue of fact as to whether Centurion had the authority and responsibility to grant Ms. Congress her requested accommodation under 9 V.S.A. § 4502(c)(5), and a factual question regarding whether, under § 4502(c)(6), Centurion took all steps necessary to ensure Ms. Congress could communicate effectively. The Commission also characterizes the trial court's decision as ruling that medical malpractice claims and VPAA claims are mutually exclusive, and argues that the trial court ran afoul of Vermont Rule of Civil Procedure 8 by denying summary judgment on Ms. Congress's medical malpractice claim but granting summary judgment on the Commission's VPAA claims. We are not persuaded by these contentions and conclude that there is no reason to disturb the trial court's decision.

¶ 9. "This Court reviews summary judgment decisions de novo, using the same standard as the trial court." Pettersen v. Monaghan Safar Ducham PLLC, 2021 VT 16, ¶ 9, 214 Vt. 269,

4

256 A.3d 604 (quotation and alteration omitted). "Summary judgment will be granted 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.' " Gauthier v. Keurig Green Mountain, Inc., 2015 VT 108, ¶ 14, 200 Vt. 125, 129 A.3d 108 (quoting V.R.C.P. 56(a)). "In determining the existence of genuine issues of material fact, courts must accept as true the allegations made in opposition to the motion for summary judgment, so long as they are supported by affidavits or other evidentiary material." Gates v. Mack Molding Co., 2022 VT 24, ¶ 13, __ Vt. __, 279 A.3d 656 (quotation omitted). "The nonmoving party is entitled to all reasonable doubts and inferences." Morisseau v. Hannaford Bros., 2016 VT 17, ¶ 12, 201 Vt. 313, 141 A.3d 745 (quotation omitted).

¶ 10. Regardless of whether there was a genuine dispute of fact as to Centurion's responsibility to provide Ms. Congress with audiology care or the adequacy of that care, summary judgment was appropriate on the Commission's VPAA claims because the Commission failed to allege a prima facie case of discrimination against Centurion under either § 4502(c)(5) or (6). Both of these subsections establish duties for a "public accommodation."

¶ 11. Subsection (c)(5) provides:

> A public accommodation shall make reasonable modifications in policies, practices, or procedures when those modifications are necessary to offer goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the public accommodation can demonstrate that making the modifications would fundamentally alter the nature of the goods, services, facilities, privileges, advantages, or accommodations.

Id. § 4502(c)(5). Subsection (c)(6) states:

> A public accommodation shall take whatever steps may be necessary to ensure that no individual with a disability is excluded, denied services, segregated, or otherwise treated differently than other individuals because of the absence of auxiliary aids and services, unless the public accommodation can demonstrate that taking those steps would fundamentally alter the nature of the goods, services, facilities, privileges, advantages, or accommodations being offered or would result in an undue burden on the public accommodation.

5

Id. § 4502(c)(6).  The VPAA defines "public accommodation" as "an individual, organization, governmental, or other entity that owns, leases, leases to, or operates a place of public accommodation."  Id. § 4501(8).  " 'Place of public accommodation' means any school, restaurant, store, establishment, or other facility at which services, facilities, goods, privileges, advantages, benefits, or accommodations are offered to the general public."  Id. § 4501(1).  The VPAA thus establishes duties to ensure access to services for the entity that "owns, leases, leases to, or operates" the facility that offers those services.  Id. § 4501(8).

¶ 12.  The Commission alleged in its complaint that Ms. Congress could not completely access certain nonmedical benefits and services offered to inmates due to her hearing impairment, including that she had difficulty engaging in telephone calls with her family and her attorneys, could not fully participate in classes, and had trouble communicating with inmates and correctional staff.  It submitted exhibits at summary judgment to support assertions that: she missed announcements for scheduled activities such as physical recreation; she could not take or finish some educational classes because she could not properly engage with materials or hear the instructor; and her hearing impairment made her into an "easy target" for fellow inmates and left her feeling vulnerable.  However, the Commission alleged that the DOC, not Centurion, "is responsible for management and oversight of the care and treatment of individuals in its custody" and "charged with the overall responsibility of overseeing funding and services provided by the State to the individuals in the custody of the DOC including supervision of contracted medical providers."  More specifically, it alleged that the DOC "operates a place of public accommodations," where it "provides a variety of benefits, services, [and] privileges for inmates . . . includ[ing] safe housing, educational and religious programs, medical services, recreational activities within the facility, communication with other inmates and staff as well as family and friends outside the facility."  As to Centurion, the Commission alleged only that it is "the State of Vermont's contracted medical provider for the DOC," and that it provides medical services "within a place of public accommodations."

6

¶ 13. By the Commission's own allegations, the prison was the "place of public accommodation." Id. § 4501(1). And the DOC was the relevant "public accommodation" because it both operated the prison and directly provided the services to which the Commission claims Ms. Congress was denied access. Id. § 4501(8). Thus, only the DOC could be held liable for any discrimination in access to those services.[2] But the Commission did not allege that Centurion discriminated against Ms. Congress in the provision of medical services—in other words, that Centurion provided better medical care to other similarly situated inmates without a disability. Because the Commission has not asserted the existence of facts that would establish that Centurion was a "public accommodation" with respect to any nonmedical services, an essential element of its claims as pled under 9 V.S.A. § 4502(c)(5) and (6), these claims fail as a matter of law.

¶ 14. The Commission contends that this type of reasoning improperly "bifurcates the responsibilities between the DOC and Centurion" because it "effectively prevents Ms. Congress from asserting any claim under the VPAA." The Commission posits that the DOC could successfully defend against any discrimination claim by arguing "that it had no control over repairing the hearing aids." The Commission overstates the implications of our holding and misinterprets the statute. We do not suggest that where two entities share control over a service, and discrimination occurs in the provision of that service, the entities can both avoid liability under the VPAA by shifting blame to the other and thereby leave the putative plaintiff without any proper defendant. Such a result would make little sense factually or legally, and would be at odds with the remedial purpose of the VPAA. See Hum. Rts. Comm'n v. Benevolent & Protective Ord. of Elks, 2003 VT 104, ¶¶ 13-14, 176 Vt. 125, 839 A.2d 576 (explaining that "[a]s a remedial statute, the [VPAA] must be liberally construed in order to suppress the evil and advance the remedy intended by the Legislature," including preventing "the deprivation of personal dignity that surely accompanies denials of equal access to public establishments" (quotations omitted)). The key

_____

[2] We do not opine on the merits of any claims against the DOC or other state defendants.

question for the Commission's claims of discrimination in access to specific benefits is what entity "owns, leases, leases to, or operates" the facility that offers those benefits. 9 V.S.A. § 4501(8). This entity, according to the Commission's own complaint, is the DOC and not Centurion.

¶ 15. Our reading of the statute is bolstered by federal case law interpreting the Americans with Disabilities Act (ADA), on which the VPAA is based. See id. § 4500(a) (stating that provisions of VPAA "establishing legal standards, duties, and requirements with respect to persons with disabilities in places of public accommodation . . . are intended to implement and to be construed so as to be consistent with the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq."). These cases instruct that the proper defendant under the ADA is the entity that controls the allegedly discriminatory condition. See Kohler v. Bed Bath & Beyond of Cal., LLC, 780 F.3d 1260, 1266 (9th Cir. 2015) (holding that ADA does not "impose[] upon tenants liability for ADA violations that occur in those areas exclusively under the control of the landlord"); Neff v. Am. Dairy Queen Corp., 58 F.3d 1063, 1067-68 (5th Cir. 1995) (holding franchisor could not be liable under ADA for allegedly discriminatory conditions of franchisee's store because franchisor did not have sufficient control over conditions to bring them into compliance with ADA); Coddington v. Adelphi Univ., 45 F. Supp. 2d 211, 215 (E.D.N.Y. 1999) (citing numerous cases applying control test and concluding that question of whether entity is proper defendant under ADA turns on whether defendant owns, leases, or is "in a position of authority and has the power and discretion to perform potentially discriminatory acts"). The Commission cites no cases to the contrary. From a practical perspective, we do not see how an order holding an agent of a "public accommodation" liable for discrimination in access to services—where that agent had no control over those services—could offer any relief or further the purposes of the VPAA. See Bowers v. Nat'l Collegiate Athletic Ass'n, 9 F. Supp. 2d 460, 485 (D.N.J. 1998) (stating that "it would be odd to saddle someone with liability for a certain discriminatory condition at a public accommodation when it is not that person who manages, controls, or regulates the public accommodation for the purpose of that particular condition" and "[i]f the contrary were the rule,

8

then it is not clear what relief could be obtained from someone who has no power to effect a remedy for the violation"). Because the Commission did not assert that Centurion had authority or control over the services to which Ms. Congress was allegedly denied access, and there is no such evidence in the record, summary judgment to Centurion was proper.[3]

¶ 16.    We turn briefly to the Commission's claim of error under Civil Rule 8. The Commission misconstrues the trial court's decision as having declared that medical malpractice and VPAA discrimination are mutually exclusive causes of action. The trial court merely explained that deficient medical care does not necessarily mean discrimination in the provision of medical care. Thus, although there may be some overlap in the facts necessary to prove claims of medical malpractice and VPAA discrimination relating to medical care, proving the former does not always prove the latter. Contrary to the Commission's argument, the trial court did not deny any party the right to assert claims in the alternative, V.R.C.P. 8(a), (e)(2), and we see no error in its analysis comparing medical malpractice to VPAA discrimination.

Affirmed.

FOR THE COURT:

_____

Associate Justice

---

[3]    Given our holding that the Commission failed to allege a prima facie case of discrimination under the VHFPAA, we do not reach the issue of whether the exception contained in § 4502(c)(7) precluded any liability regarding the provision of hearing aids.

9